[No. S068704. Aug. 14, 2000.]

In re EBEN GOSSAGE on Admission.

COUNSEL

Law Offices of Ephraim Margolin, Ephraim Margolin and Bradford L. Battson for Petitioner Eben Gossage.

Marie M. Moffat, Richard J. Zanassi, Jill A. Sperber, Andrea T. Wachter and Bruce H. Robinson for Respondent State Bar of California.

OPINION

THE COURT.—While addicted to drugs and alcohol, Eben Gossage (Gossage) killed his sister under circumstances involving moral turpitude, and was convicted of voluntary manslaughter. He committed other crimes involving dishonesty and moral turpitude around the same time, and was convicted of several forgeries. After committing his last felony offense, and after serving his most recent term in prison, Gossage took steps to change his life. He overcame substance abuse, attended college and law school, and sought admission to the State Bar.

However, while preparing to become a lawyer, Gossage sustained numerous misdemeanor convictions involving, for the most part, willful failure to appear in court and willful failure to obey court orders. These recent offenses are reminiscent of Gossage's behavior in prior judicial proceedings, when he failed to make court-ordered appearances and violated court-ordered conditions of probation and parole. Moreover, of the 17 criminal convictions received throughout his adult life, Gossage mentioned only four on his application for admission. Such omissions occurred even though full disclosure was required, and even though he swore his application was complete.

The Committee of Bar Examiners of the State Bar (Committee) conducted a preliminary investigation and declined to certify Gossage for admission on the ground he lacked the requisite good moral character. Gossage appealed to the State Bar Court. Following an evidentiary hearing, the hearing department recommended that he be admitted to the practice of law. By a two-to-one vote, the review department adopted the hearing department's decision.

The Committee sought, and this court issued, a writ of review. We conclude Gossage has not overcome the heavy burden of proving his own rehabilitation, and that he is not presently fit to practice law. In reaching a contrary conclusion, the State Bar Court overlooked relevant considerations and made findings not supported by the record. We will therefore reject the recommendation of admission. (See Cal. Rules of Court, rules 952.6, 954.)

## I. FACTS

Gossage was born in 1954, the son of a prominent advertising executive in San Francisco. Gossage's parents divorced when he and his younger sister, Amy, were small children. Around age 15, not long after his father died, Gossage began consuming alcohol and illicit drugs. At age 18, Gossage apparently neither worked nor attended school, and injected heroin at a cost of $100 to $200 a day. He lived on money inherited from his father and from his grandfather, who died when Gossage was 18. Gossage also stole to support his drug habit.

In 1973, shortly before turning 19, Gossage stole, forged, and cashed several checks belonging to his mother. He pled guilty to one count of forgery, a felony, and received probation. (See Pen. Code, § 470.) Judgment was entered by the San Francisco Superior Court on October 2, 1973.

A few months later, Gossage, then 19 and on probation, stole, forged, and cashed several checks belonging to his grandmother. He pled guilty to two felony counts of forgery on February 11, 1974. (See Pen. Code, § 470.) Before sentencing, Gossage was referred to a drug rehabilitation program, but was found unsuitable for treatment due to his disruptive behavior and persistent drug use. Hence, on August 5, 1974, the Marin County Superior Court sentenced Gossage to probation including one year in county jail. Around the same time, probation was revoked, and then restored and modified in the San Francisco forgery case. Meanwhile, Gossage's mother died while he was in custody.

After his release from custody, Gossage did not seek employment and continued receiving inheritance money. He began using heroin again, and binged on alcohol. On February 13, 1975, while on probation for forgery, Gossage visited his 19-year-old sister Amy, who lived nearby in San Francisco. The encounter turned violent, and Gossage killed Amy. His testimony at the State Bar hearing made clear that he overreacted to his sister's threatening behavior, continued attacking her with weapons after all threat

had ceased, fled the scene without rendering medical aid, and used deceit in order to conceal his guilt. Gossage was arrested and charged with murder.[1]

According to Gossage's State Bar testimony, the jury in the criminal trial rejected his claim that he "did not intend to take [Amy's] life." He was convicted of voluntary manslaughter. (See Pen. Code, § 192.) On September 3, 1975, an indeterminate sentence was imposed. Gossage spent the next two and one-half years in state prison. He was paroled on February 24, 1978.

Gossage promptly resumed his prior lifestyle—using heroin and squandering his inheritance. He posed an ongoing threat to the public, as evidenced by various crimes committed over the next several years.

In March 1978, a few weeks after his release from prison, Gossage crashed into a parked car while speeding and driving drunk in San Francisco. He pled guilty to reckless driving, a misdemeanor, on June 2, 1978. (See Veh. Code, § 23103.) He received probation for this offense. He also served time in jail for violating parole in the manslaughter case, which terminated in October 1979.

In July 1978, while on probation and parole, Gossage drove intoxicated in Solano County. On November 7, 1978, he pled no contest to the misdemeanor offense of driving under the influence of alcohol (DUI), and received probation. (See Veh. Code, § 23152.) Gossage completed an alcohol

---

[1]Gossage was the only witness who described the circumstances surrounding the killing at the State Bar hearing. According to this detailed account, Amy, who regularly snorted cocaine, began arguing with Gossage over their mother's alcohol abuse and recent death. Gossage testified that even though there was no history of violence between them, Amy became physically aggressive, throwing small household objects at him and pulling his hair. As Gossage tried to move away, Amy swung at him with a hammer and then tried to stab him in the face with scissors. The pair struggled for control of the weapons, and fell together onto the bed.

According to Gossage, he next grabbed the hammer and struck Amy in the head with it many times until she stopped moving and he could disentangle himself from her body and from the bedsheets. Gossage then sat upright and took the scissors from Amy's hand. Seeing she was lying motionless on her stomach with blood running from her head, and not knowing whether she was dead, Gossage called her name and received no response. He then placed his ear close to Amy's mouth. When he realized she was not breathing, he became angry and repeatedly stabbed her in the neck and back with the scissors.

When the stabbing was completed, Gossage considered but rejected the notion of calling someone for help, such as his aunt or grandmother. Instead, he fled with the weapons wrapped in a towel, and hid the items in his closet at home. After changing his bloodstained clothes, Gossage returned to Amy's building and asked the manager to enter her unit. In so doing, Gossage feigned concern for Amy's safety and lied about needing to meet her in the apartment. He conceded at the State Bar hearing that there was "no need" for him to hit Amy with the hammer so many times. He testified, "I could have probably hit her once or twice and that would have been the end of the altercation between us and she would be alive." Nothing in Gossage's State Bar testimony indicated that he was under the influence of heroin or any other substance during the crime. He expressed remorse for taking his sister's life.

awareness program imposed as a condition of probation, but only after he first failed to appear and the court issued a bench warrant for his arrest.

In 1979, Gossage stole jewelry and other valuables from a family friend, Mrs. Schwabacher, who had invited him to live in her home to encourage his rehabilitation. She confronted him about the thefts, and caused criminal charges to be filed by the district attorney. Gossage retrieved some of the stolen items from drug dealers and pawnshops. Largely through the efforts of Gossage's criminal defense attorney, LeRue Grim, Mrs. Schwabacher also received compensation from the last of Gossage's inheritance money. Criminal charges were subsequently dismissed.

In May 1981, Gossage was arrested and charged in San Francisco with possession of heroin, a felony (see Health & Saf. Code, § 11350, subd. (a)), and with public intoxication, a misdemeanor (see Pen. Code, § 647, subd. (f)). Gossage pled guilty to both crimes on September 4, 1981. Gossage initially received probation on condition he serve time in county jail. On the surrender date, Gossage failed to appear, and a bench warrant issued for his arrest, apparently because he was in federal custody for reasons discussed further below. The trial court ultimately vacated the original sentence and imposed a state prison term, "sentence suspended and 4 years probation."

In June 1981, police officers found Gossage unconscious behind the steering wheel of his car on the Presidio military base near San Francisco. He was tried and convicted in federal district court of DUI with a prior DUI conviction. (See Veh. Code, § 23152.) Judgment was entered February 5, 1982. Gossage served time in federal custody as a result.

In September 1982, Gossage was charged with forgery and other felonies after he impersonated a guest at the Mark Hopkins Hotel in San Francisco, and charged a watch in the gift shop to a room he had not rented. The district attorney agreed to dismiss all criminal charges when Gossage stipulated to revocation of his probation in the 1981 heroin possession case. On November 5, 1982, probation was revoked, suspension of sentence on the underlying crimes was lifted, and Gossage was sent to state prison.[2]

Gossage testified at the State Bar hearing that he "hit bottom" in prison, and believed he would soon die if he did not stop using drugs and alcohol.

[2]At the sentencing hearing, the trial court made the following remarks to Gossage: "I am disappointed in your failure to comply with the terms of your probation . . . . I have rarely given a defendant the breaks that I have given you. . . . I perceive that you are an extremely manipulative young man. . . . [¶] [Y]ou have never really come to grips with your own responsibilities for your own actions. [¶] Now, I hope that the period you will spend in state prison will give you time to reflect on that, and maybe you will be a better man when you get out, but I am not sure about that . . . ."

He resolved to end such behavior and, by all accounts, has been sober since that time. Gossage was paroled from prison in June 1983, and discharged from parole on July 14, 1984.

Upon his release, Gossage enrolled at California State University, Sonoma, informing the school about his manslaughter conviction and recent prison term. The first two years of undergraduate study were spent in an innovative interdisciplinary program in which he performed quite well. He received financial aid in college, and worked 20 to 30 hours a week driving a delivery truck and performing odd jobs. Gossage graduated in 1987.[3]

Gossage entered Golden Gate University Law School in January 1988, after being interviewed about his criminal record.[4] A short time later, Professor Minkus, who taught legal ethics, began discussing with Gossage the problems he might face gaining admission to the State Bar due to his past crimes. Gossage performed community service during law school.[5] He also worked for different lawyers, including Grim, his criminal defense attorney.

---

[3]Gossage experienced certain legal problems as an undergraduate student. He was briefly jailed after he first enrolled in college, apparently because he violated parole when he moved to Sonoma County.

Gossage also was sued by Rick Minervini, who worked on the Sonoma college campus. Minervini testified at the State Bar hearing as follows. In September 1983, he agreed to sell Gossage a car. Because Minervini knew Gossage was an ex-convict who needed help, Minervini allowed Gossage to drive the car until he could pay for it with financial aid. However, Gossage did not pay or contact Minervini at the specified time. Minervini extended the time for payment on two subsequent occasions, but again nothing happened. Meanwhile, Minervini learned that Gossage had received as many as six parking tickets, totaling $200, while driving Minervini's car. When confronted about the problem, Gossage promised to pay the tickets, but failed to do so. Minervini eventually reclaimed the car and sued Gossage in small claims court for the cost of the parking tickets. Judgment was entered in a stipulated amount and was paid by Gossage. The only additional information Gossage provided at the State Bar hearing was that he did not pay for the car on the first due date because he had overestimated the financial aid he would receive. Gossage apologized for breaking his promises to Minervini and for inflicting additional harm in the form of the parking tickets.

[4]Applicants for admission to the State Bar may seek a moral character determination from the Committee when their law school career begins, and not only when it ends. Under rule X, section 2(a) of the Rules Regulating Admission to Practice Law (Rules of Admission), an "Application for Determination of Moral Character . . . may be filed at any time after registering with the Committee." For nonattorney applicants, such registration must occur "not later than 90 days after he or she begins the study of law." (*Id.*, rule V, § 2(a).) Once the application for a moral character determination is filed, the Committee must respond within 180 days. (*Id.*, rule X, § 2(c).) As noted in the text, Gossage began law school in January 1988, and filed his moral character application with the Committee six years later, in January 1994.

[5]Gossage testified at the State Bar hearing that he and other students organized the Earth Island Legal Defense Foundation, which was intended to provide pro bono legal services in environmental cases. The program faltered after about one year, but Gossage hoped to revive it around the time of the State Bar hearing. Gossage also volunteered as a law student with La Casa de las Madres, a battered women's support group, and joined Amnesty International on

Gossage finished law school in December 1991. He took and passed the bar examination for the first time in February 1993.

During a six-year period beginning six months before he entered law school, and ending almost six months after he took the bar examination, Gossage repeatedly violated state traffic laws and sustained several misdemeanor convictions for mishandling these matters in court. Gossage ranged from age 33 to age 39 during this time.

In July 1987, Gossage was cited in Marin County for lacking a commercial vehicle weight registration on his truck, and for driving with bald tires and with an expired license. (See Veh. Code, §§ 9400, 12951, subd. (a), 27465, subd. (b).) He signed the citation requiring his appearance within 21 days, and gave the officer his address in Sausalito. At some point, the officer discovered that Gossage's license was suspended, and issued a citation to that effect. (*Id.*, § 14601.1, subd. (a).) The Marin Municipal Court subsequently sent a courtesy notice to the Sausalito address stating that "appearance is mandatory," and requiring Gossage to "report to the traffic counter" by a certain date in order to avoid an arrest warrant. The notice listed the pertinent Vehicle Code violations, including the suspended-license charge. Gossage never appeared in court in response to the citations and notice.[6]

In September 1988, Gossage was cited in Marin County for driving with an expired vehicle registration, and for driving without a valid driver's license in his possession, without evidence of financial responsibility, and without wearing a seat belt. (See Veh. Code, §§ 4000, subd. (a), 12951, subd. (a), 16028, subd. (a), 27315, subd. (d).) Gossage signed the citation requiring his appearance within 21 days, and gave the officer his address in Stinson Beach. A courtesy notice was evidently sent to that address. Gossage failed to appear in court.[7]

---

a paid work-study basis. Over a 10-year period, including the time he spent in law school, Gossage regularly visited his friend and former grade school teacher, Mr. Nowe, who was aged and infirm.

[6]Gossage testified at the State Bar hearing that he corrected all registration, equipment, and license violations at the Department of Motor Vehicles (DMV) and the Sausalito Police Department, and that he mailed proof of the corrections to the Marin courthouse within 21 days of the original citation. Gossage did not acknowledge receipt of the courtesy notice requiring him to report to court in person on the suspended-license and other charges. The only explanation offered for not receiving the notice was the general lack of mail delivery at the Sausalito address he had given during the traffic stop—a houseboat.

[7]Gossage conceded at the State Bar hearing that he allowed his vehicle registration to lapse to save money. He testified that after receiving the citation, he sent the Marin courthouse "proof of correction of three of the four [violations] on the ticket, that is, insurance, driver's license, and registration." In other words, Gossage essentially admitted taking no action in

In April 1989, Gossage was cited in Marin County for driving with a suspended license and for driving without evidence of financial responsibility. (See Veh. Code, §§ 14601.1, subd. (a), 16028, subd. (a).) He signed the citation, which said that his appearance in court was required and that he would later be advised of the date. He also gave the officer his address in San Francisco. A notice to appear was apparently mailed. Gossage failed to appear in court.[8]

Gossage somehow learned that bench warrants had issued for his arrest based on the foregoing events. On August 8, 1990, he appeared in Marin Municipal Court and pled guilty to five misdemeanor offenses—two counts of driving with a suspended license (see Veh. Code, §§ 14601.1, subd. (a), 40000.11, subd. (k)), and three counts of willfully violating a written promise to appear (see *id.*, §§ 40508, subd. (a), 40000.25). Gossage was ordered to show proof of a valid driver's license and financial responsibility by a certain date. The court also ordered payment of fines and penalties totaling $925—a requirement Gossage did not meet.[9]

In September 1991, Gossage was cited in San Francisco for driving without a vehicle registration, for failing to properly transfer a vehicle registration, and for making an illegal left turn. (See Veh. Code, §§ 4000, subd. (a), 5902, subd. (a), 22101, subd. (d).) He signed the citation. However, he did not "appear or submit bail" with respect to all violations within 21 days, as the citation required.[10]

---

response to the seat belt violation. He also admitted that it was clear from the face of the citation that some of the violations could not be fixed by mail. Regarding any courtesy notice sent by the court, Gossage implicitly denied receipt on the ground no mail was delivered at the Stinson Beach address he had given during the traffic stop.

[8]Gossage testified at the State Bar hearing that he responded to the citation solely by renewing his registration and sending proof of registration to the court. In other words, he essentially admitted not reporting to the court on the suspended-license violation. Again, Gossage implied that he did not receive any notice to appear because mail did not regularly arrive at the San Francisco address he had given during the traffic stop—an apartment building located on Russian Hill. Gossage explained that the landlord let him live in vacant apartments on a rotating basis, and that this rent-saving arrangement often disrupted mail delivery.

[9]Gossage testified at the State Bar hearing that he complied with the license and insurance conditions of the court's order in a timely fashion. However, he acknowledged paying no more than $225 towards the total $925 fine. The $925 amount was apparently calculated by adding individual fines and penalties of $255, $320, and $350, for each of the three sets of traffic citations issued in 1987, 1988, and 1989, respectively. Gossage offered no reason for failing to pay the full fine ordered by the court other than his own confusion as to the amount of money due.

[10]Gossage testified at the State Bar hearing that he sent the court the fine for the moving violation, but not for the other two registration violations. Instead, because the car was decrepit and rarely driven, he submitted a certificate of nonoperation by mail, and erroneously assumed no further action was necessary. A bench warrant for his arrest issued—an outcome

In December 1991, Gossage received a letter from the DMV stating that his license was suspended for failing to pay fines that had been ordered one and a half years earlier by the Marin Municipal Court.[11] On January 3, 1992, he appeared and pled guilty to three misdemeanor counts of willfully failing to pay a lawful traffic fine. (See Veh. Code, §§ 40508, subd. (b), 40000.25.) The court ordered payment of the overdue fines by a certain date—a requirement Gossage again did not meet.[12] Bench warrants for his arrest issued in October 1992.

It was not until June 1993 that all outstanding traffic matters were resolved. On June 16, Gossage appeared in Marin Municipal Court and paid $700 in fines and penalties owed on citations issued in September 1988 and April 1989.[13] On June 24, Gossage appeared in San Francisco Municipal Court and pled guilty to two registration infractions based on the citation issued in September 1991. (See Veh. Code, §§ 4000, subd. (a), 5902, subd. (a).) The court dismissed a misdemeanor nonpayment-of-fine charge on the latter occasion. (See Veh. Code, § 40508, subd. (b).) A $275 fine was ordered and apparently paid.

---

Gossage essentially admitted he could have avoided by asking the court how to properly resolve the registration violations.

[11]Gossage testified that he routinely informed the DMV of changes in his address when he moved. He acknowledged receiving the DMV letter in December 1991, even though he was living at the Russian Hill address where he claimed other critical mail did not arrive, such as the notice to appear concerning the April 1989 citation.

[12]Gossage acknowledged at the State Bar hearing that his attempts to comply with the court's order were ineffectual based, at least in part, on his confusion over how much money was owed. Specifically, the total fine ordered on January 3, 1992 was $1,000—an amount apparently calculated by adding individual fines and penalties of $280, $345, and $375, for each of the three sets of traffic citations issued in 1987, 1988, and 1989, respectively. Gossage testified that he subsequently wrote to the court seeking (1) credit for $225 he previously paid when the fines were first ordered on August 8, 1990, and (2) an additional reduction in penalties that had been assessed for late payment. Around the same time, Gossage purportedly paid an additional $325 to the court. The next thing that happened is that he received a letter from the court saying that he owed between $600 or $700. Although he admitted that nothing in the letter supported such an interpretation, Gossage assumed the court had agreed to reduce the overall fine pursuant to his earlier request, and that the court had not yet credited him for paying either $225 in 1990, or $325 in 1992. Gossage conceded that, in hindsight, it might have been more reasonable to conclude that the court's letter simply acknowledged either the $225 credit or the more recent $325 payment. In any event, Gossage sent one last payment of $100 and believed the debt was thereby paid in full. Thus, by his own account, Gossage paid no more than $650, even though he knew he had been ordered to pay $1,000, and even though the court never explicitly excused him from paying the difference between these two amounts.

[13]The State Bar Court record includes docket entries suggesting that Gossage pled guilty to certain offenses on June 16, 1993, including, perhaps, two misdemeanor counts of willful failure to pay a lawful traffic fine. (See Veh. Code, § 40508, subd. (b).) However, the Committee concedes here, as below, that the record is not sufficiently clear in this regard. Hence, the Committee emphasizes the eight misdemeanor convictions entered against Gossage by the Marin Municipal Court prior to June 16, 1993—six of which involved either willful failure to appear in court or willful nonpayment of court-ordered fines.

Six months later, in January 1994, Gossage applied to the Committee for a moral character determination (Application). He testified at the State Bar hearing that he spent substantial time completing the document and took the matter seriously. However, the Application contained incomplete and incorrect answers in several areas, including locations where Gossage lived and worked during college and law school, the circumstances surrounding his default on a student loan, and the precise outcome of the Minervini lawsuit in small claims court.

Most notable, however, were omissions in information provided in the criminal history section of the Application. Specifically, question No. 11.1 required disclosure of each conviction for "the violation of any law, ordinance, misdemeanor or felony," whether obtained by a guilty verdict or by a plea of guilty or no contest. The question emphasized that all convictions—"no matter how minor the incident"—must be listed, except for "[t]raffic violations which did not result in a misdemeanor or felony conviction." The instructions for question No. 11.1 directed Gossage to attach copies of certain official documents relating to each conviction.[14] Another question, No. 13.6, asked whether any complaint for fraud or forgery had been sustained against Gossage in any civil or criminal forum.

In response to these questions, Gossage disclosed only four convictions, including only one of three forgery counts.[15] No official supporting documents were attached. At no point in the Application did Gossage mention any of the 13 other criminal convictions he had sustained.[16]

Notwithstanding these omissions, Gossage signed the Application and declared under penalty of perjury that he had "carefully read the questions" and "answered them truthfully, fully, and completely." The quoted language appeared in boldface type in a paragraph located above the signature line. The same declaration provision warned—again in boldface type—that defective answers could result in denial of the application.[17]

The State Bar hearing took place in July 1996. At that time, Gossage and a business partner, Christian Barbe, had worked for several years developing

---

[14]Such documents included any certified copy of the conviction and any arrest report, complaint, indictment, verdict, sentence, appeal, and probation report.

[15]Gossage disclosed three felonies (one Marin forgery, voluntary manslaughter, and heroin possession), and one misdemeanor (the Presidio DUI).

[16]Gossage omitted two felonies (one Marin forgery and the San Francisco forgery), and 11 misdemeanors (reckless driving in San Francisco, DUI in Solano County, public intoxication in San Francisco, two suspended-license convictions, three failure-to-appear convictions, and three nonpayment-of-fine convictions). He also erroneously stated on his application that judgment in the Marin forgery case was entered October 2, 1973. However, this date belongs to the San Francisco forgery conviction, which Gossage otherwise failed to mention.

[17]Gossage testified at the State Bar hearing that he withheld information about all eight misdemeanor convictions based on Vehicle Code violations committed between 1987 and

live-work lofts in San Francisco. During the same period, Gossage assisted various nonprofit groups dedicated to urban redevelopment, lobbied public officials and agencies about the harmful effects of pollution on city residents, and volunteered in local political campaigns. Gossage testified that he had also volunteered as a mathematics tutor at the University of San Francisco, but lacked the necessary academic skills. Hence, beginning a few months before the State Bar hearing, he helped drug-addicted youths prepare for their high school equivalency test at Walden House, a local rehabilitation center.

Gossage presented testimony by 20 lay witnesses, most of whom he met after he was last released from prison and many of whom said they knew him well. They included his girlfriend and other personal friends, his real estate partner and other business associates, college and law school professors, and prominent public officials, such as State Senator John Burton, San Francisco District Attorney Terence Hallinan, and San Francisco Supervisor Susan Bierman. Also appearing for Gossage were two attorneys who had represented him in criminal court (Grim and Brown), one attorney who attended law school with Gossage, one attorney with whom he worked as a student law clerk, and one attorney who was his landlord. The foregoing witnesses described Gossage as an honest person who had expressed remorse for killing his sister and for committing drug-related crimes. No one had seen Gossage under the influence of drugs or alcohol since he was last released from prison in 1983.

1993, because he incorrectly assumed they were infractions and were exempt from the reporting requirement. He did not review DMV or court records, consult with counsel, or check the Vehicle Code in making this decision.

Regarding all other criminal convictions, Gossage testified that he completed the Application based on his faulty memory at the time. Although he remembered forging his mother's checks in San Francisco and forging his grandmother's checks in Marin, the Application only mentioned his conviction in the latter case because he forgot having been charged and convicted in the first case. Gossage further admitted that he made little effort to ensure the accuracy of his memory or his answers with respect to all information provided in this section of the Application. For instance, while he obtained a long and confusing "rap sheet" from the San Francisco Hall of Justice, he did not read it carefully or seek help in deciphering it. Gossage did discuss his criminal record with Grim, the attorney who defended him several times. However, both Gossage and Grim testified at the State Bar hearing that Grim's memory was limited and that the only new information Gossage apparently received during this meeting was that he had been convicted of two counts of forgery (not one) in the Marin case involving his grandmother's checks. Gossage did not consult with any other attorney concerning his criminal history, including San Francisco Public Defender Jeff Brown, who appeared on Gossage's behalf in the San Francisco forgery case and who testified for Gossage at the State Bar hearing. In fact, the only other step Gossage took before completing the Application was to review the superior court file of the manslaughter case, which he claimed was almost empty. Gossage did not review court files concerning his many other San Francisco convictions, nor did he attempt to obtain any information from neighboring Marin and Solano Counties, where convictions against him were also obtained.

Five mental health professionals interviewed Gossage shortly before the State Bar hearing.[18] These individuals opined that Gossage had successfully overcome any substance abuse problem or personality disorder afflicting him in the pre-1983 period, when he killed his sister and committed other serious crimes. None saw any sign that Gossage presently suffered from a diagnosable mental disorder or psychopathological condition. However, the Committee's witness, Dr. Feinberg, could not eliminate the possibility that Gossage's failure to promptly resolve the traffic citations during law school was the product of a "residual" inability or unwillingness to abide by societal rules. One of Gossage's witnesses, Dr. Carfagni, similarly suggested that receiving four to six traffic tickets over a three- to five-year period might reveal the presence of an antisocial attitude or personality.

## II.  State Bar Court Findings

We focus on the decision of the Review Department of the State Bar Court (Review Department), which adopted the findings of the hearing panel based on an independent review of the record. Although it professed some difficulty in reaching this result, a majority of the Review Department (majority) found what it called "clear and convincing evidence" that Gossage is rehabilitated and possesses good moral character. The dissenting member of the Review Department wrote separately and disagreed with the majority's conclusion (dissent).

The majority first reviewed the period between 1973 and 1982, when Gossage committed his most serious crimes. Aggravating facts were omitted from this review, namely that Gossage was on probation or parole when certain crimes like the voluntary manslaughter occurred, that he failed to appear in criminal court as required on some occasions, and that probation was revoked in lieu of prosecution for forgery and other felonies charged in the Mark Hopkins Hotel matter. The majority examined admission cases decided in *other* jurisdictions concerning bar applicants who had committed felony offenses similar to Gossage's pre-1983 crimes. However, the majority never discussed whether voluntary manslaughter and forgery involve moral turpitude under *California* law, or how such a determination bears on Gossage's admission.

The majority next found that Gossage underwent wholesale change between 1982, when he "hit bottom" in prison, and 1996, when the State Bar

---

[18]The opinions of four of the mental health experts were offered by Gossage at the State Bar hearing—three in the form of live testimony and one in the form of a written report introduced into evidence. The fifth mental health expert was called as a witness by the Committee.

hearing occurred. In so doing, the majority relied on the favorable opinions of lay and expert witnesses, Gossage's expressions of remorse, and his community service beginning in law school. No sign of bad moral character was seen in any of the legal problems Gossage experienced after leaving prison in 1983. The majority examined each incident during this period, but did so in isolation, finding excuses or mitigation in each case. However, the majority again omitted and misstated relevant facts, and it never confronted the ominous implications of the *pattern* of misconduct committed while Gossage was preparing to be a lawyer.

In particular, the majority viewed Gossage's failure to pay Minervini for the car and parking tickets, and the ensuing small claims judgment, as too old to have any bearing on present moral character. The majority concluded, without elaboration, that Gossage is no longer capable of such misconduct.[19]

The majority also found that Gossage reasonably believed he had corrected each traffic citation out of court, that he never received notices suggesting the contrary was true, and that he initiated traffic court appearances whenever he learned of any problems. The majority praised Gossage for not receiving any additional citations between 1993, when he last appeared in traffic court, and 1996, when the State Bar hearing occurred. At no point, however, did the majority identify or discuss the true number, or the repetitive and, in most cases, willful nature, of misdemeanor convictions entered against Gossage based on Vehicle Code violations committed between 1987 and 1993.

Regarding the Application, the majority found that all defects were inadvertent and excusable, including Gossage's failure to disclose most of his criminal convictions. The majority relied on the complex nature of his criminal record, his effort to obtain relevant information from Attorney Grim, Gossage's mistaken belief that his recent Vehicle Code convictions need not be reported, and his cooperation with the Committee once its investigation was underway. In describing the criminal convictions that should have appeared on the Application, the majority said that Gossage omitted "his recent Vehicle Code violations [plus] one of two forgery convictions and one of two driving while under the influence convictions." However, this language suggests that the majority itself failed to notice or consider three other convictions missing from the Application—forgery, reckless driving, and public intoxication.

The dissent insisted that notwithstanding his accomplishments, Gossage is not morally fit to practice law. The dissent observed that when his more

---

[19]The Minervini incident occurred in late 1983, and not in 1982 as stated by the majority.

recent misconduct is viewed in light of his prior crimes, there is no meaningful period in Gossage's adult life when he has not incurred convictions and otherwise shirked legal responsibilities. The dissent perceived a dangerous tendency in Gossage to excuse his misdeeds, including those committed after he entered law school, when he should have been more sensitive to the rule of law. According to the dissent, admission should be denied "at this time."[20]

## III. DISCUSSION

### A. *Gossage is required to present a powerful case in favor of admission.*

Attorneys must possess good moral character. (Bus. & Prof. Code, §§ 6060, subd. (b), 6062, subd. (b); see *id.*, § 6064.) Good moral character includes traits of "honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, respect for and obedience to the laws of the state and the nation and respect for the rights of others and for the judicial process." (Rules of Admission, rule X, § 1.) Persons of good character also do not commit acts or crimes involving moral turpitude—a concept that embraces a wide range of deceitful and depraved behavior. (See *In re Strick* (1983) 34 Cal.3d 891, 901-903 [196 Cal.Rptr. 509, 671 P.2d 1251]; *In re Fahey* (1973) 8 Cal.3d 842, 849 [106 Cal.Rptr. 313, 505 P.2d 1369, 63 A.L.R.3d 465]; *Hallinan v. Committee of Bar Examiners* (1966) 65 Cal.2d 447, 452 [55 Cal.Rptr. 228, 421 P.2d 76] (*Hallinan*).) ▇ Because both admission and disciplinary proceedings concern fitness to practice law as evidenced by acts of moral turpitude, this court routinely consults its disciplinary cases in deciding whether applicants for admission possess, at the outset, the requisite moral character. (*Hallinan, supra,* 65 Cal.2d at p. 453; e.g., *In re Menna* (1995) 11 Cal.4th 975, 988-989 [47 Cal.Rptr.2d 2, 905 P.2d 944] (*Menna*); *Seide v. Committee of Bar Examiners* (1989) 49 Cal.3d 933, 938 [264 Cal.Rptr. 361, 782 P.2d 602] (*Seide*).)

However, unlike in disciplinary proceedings, where the State Bar must show that an already admitted attorney is unfit to practice law and deserves professional sanction, the burden rests upon the candidate for admission to prove his own moral fitness. (Rules of Admission, rule X, § 1; *Hallinan, supra,* 65 Cal.2d 447, 451.) In outlining the basic issues and order of proof, we have said that where the applicant presents a prima facie case of good

---

[20]The dissent alluded to rule X, section 6 of the Rules of Admission, which describes the circumstances under which unsuccessful applicants may reapply for admission. The rule states, "An applicant who has received an adverse moral character determination may file another Moral Character Application after the expiration of two (2) years from the date of the final determination by the Committee or such shorter or longer period as may have been set by the Committee, for good cause shown, at the time of such denial."

character and the Committee rebuts with evidence of bad character, the burden falls squarely upon the applicant to demonstrate his rehabilitation. (*Menna, supra,* 11 Cal.4th 975, 984; *March v. Committee of Bar Examiners* (1967) 67 Cal.2d 718, 731 [63 Cal.Rptr. 399, 433 P.2d 191].)

■ Because the hearing panel is in the best position to assess demeanor and credibility, its findings are accorded significant weight on review. Similarly, the moral character determinations of the Committee and the State Bar Court play an integral role in the admissions decision, and both bear substantial weight within their respective spheres. (*Menna, supra,* 11 Cal.4th 975, 985.) However, neither determination is binding on this court. We independently examine and weigh the evidence, and pass on its sufficiency. (*Ibid.,* citing *Pacheco v. State Bar* (1987) 43 Cal.3d 1041, 1047 [239 Cal.Rptr. 897, 741 P.2d 1138].)

■ Cases authorizing admission on the basis of rehabilitation commonly involve a substantial period of exemplary conduct following the applicant's misdeeds. (E.g., *Kwasnik v. State Bar* (1990) 50 Cal.3d 1061, 1071-1072 [269 Cal.Rptr. 749, 791 P.2d 319] [emphasizing seven- or eight-year period that elapsed since applicant wrongfully evaded payment of a civil judgment]; *Martin B. v. Committee of Bar Examiners* (1983) 33 Cal.3d 717, 726 [190 Cal.Rptr. 610, 661 P.2d 160] [emphasizing nine-year unblemished record after applicant was accused of rape as a Marine]; *Hall v. Committee of Bar Examiners* (1979) 25 Cal.3d 730, 742 [159 Cal.Rptr. 848, 602 P.2d 768] [emphasizing six-year period in which no complaints were lodged against applicant's employment business after his business license was temporarily suspended by an administrative agency].) Of course, the more serious the misconduct and the bad character evidence, the stronger the applicant's showing of rehabilitation must be. (*Menna, supra,* 11 Cal.4th 975, 987, citing *Kwasnik v. State Bar, supra,* 50 Cal.3d at p. 1086 (dis. opn. of Lucas, C. J.); see *In re Nevill* (1985) 39 Cal.3d 729, 735 [217 Cal.Rptr. 841, 704 P.2d 1332] [applying similar principle to disbar attorney convicted of voluntary manslaughter]; *Roth v. State Bar* (1953) 40 Cal.2d 307, 313 [253 P.2d 969] [applying similar principle to deny reinstatement to disbarred attorney convicted of grand theft].)[21]

---

[21]Not surprisingly, compelling evidence of reform is most often required when an attorney seeks reinstatement following disbarment, or when an attorney disbarred in another state seeks admission here. (See *Menna, supra,* 11 Cal.4th 975, 985-987.) Although the standard has been articulated in different ways, such persons basically must show good moral character by means sufficient to overcome the prior adverse determination on disbarment. (*Id.* at p. 989 [requiring " 'overwhelming' " proof of rehabilitation through a "lengthy period" of "unblemished" and "exemplary" conduct]; *Hippard v. State Bar* (1989) 49 Cal.3d 1084, 1092 [264 Cal.Rptr. 684, 782 P.2d 1140] [requiring "the most clear and convincing evidence" of

Only a compelling showing of reform will suffice here. Central to this determination are the circumstances surrounding the voluntary manslaughter conviction—a killing that even Gossage described as brutal and unnecessary. We assume that, consistent with Gossage's State Bar testimony, Amy attacked him with a hammer and scissors, he honestly believed he needed to defend himself, and he had the right to resist with an appropriate amount of force.

Nevertheless, the ensuing circumstances show moral turpitude on Gossage's part. Gossage admitted that he continued hitting Amy in the head with the hammer long after she ceased offering any resistance. Free of any actual or perceived threat of harm, Gossage sat upright on the bed and surveyed the situation. He noticed that Amy was badly injured, that she was lying motionless on the bed, and that she had stopped breathing. Rather than render or summon aid, Gossage became newly angry at Amy, and repeatedly stabbed her with the scissors, inflicting further potentially fatal injuries. After this final phase of the attack was over, Gossage dismissed the notion of obtaining the emergency medical assistance that Amy required. Instead, he collected the weapons and fled the crime scene. Gossage then took various steps to conceal his guilt. As part of this plan, he returned to Amy's apartment building, pretended to be worried about her, and lied about his reason for being there.

In two prior cases, we have found moral turpitude and have disbarred attorneys convicted of voluntary manslaughter under circumstances similar to the present case. (*In re Strick* (1987) 43 Cal.3d 644, 647-648, 653-657 [238 Cal.Rptr. 397, 738 P.2d 743] [drug-addicted attorney shot an acquaintance during an argument, failed to provide medical aid while the victim died of his gunshot wound, hid the homicide weapon, and lied to police to avoid responsibility for the crime]; *In re Nevill, supra,* 39 Cal.3d 729, 731-733, 735-739 [attorney who abused drugs and who had an acrimonious marriage shot and killed his wife after first trying to frighten her with the gun].) Disbarment was warranted in the foregoing cases because the underlying acts—though unrelated to the practice of law—showed a dangerous volatility (*Nevill,* at p. 735), and a conscious and selfish disregard for the law

reform]; *Feinstein v. State Bar* (1952) 39 Cal.2d 541, 547 [248 P.2d 3] [requiring evidence of rehabilitation that is both "clear and convincing" and "overwhelming"]; *Kepler v. The State Bar* (1932) 216 Cal. 52, 55 [13 P.2d 509] [requiring "positive evidence" of "successful" rehabilitation].) The Committee suggests that a similar showing should be required whenever *anyone* seeking a license to practice law has committed acts of moral turpitude, even where no prior disciplinary record exists. Such a bright-line question need not be decided here. Our State Bar decisions already embrace the commonsense notion that rehabilitation cannot be determined separate and apart from the offenses from which one claims to be rehabilitated. This principle places a heavy burden on Gossage, as discussed, *ante,* in the text.

and for the rights of others (*In re Strick, supra,* 43 Cal.3d at p. 653). We reached this conclusion despite mitigating evidence that the attorneys each suffered from emotional and substance abuse problems at the time of the crime, and even though both were trying to rehabilitate themselves after receiving a prison sentence for the homicide.

Here, of course, the voluntary manslaughter conviction is not the only felony committed by Gossage involving moral turpitude. Criminal acts of dishonesty committed for financial gain necessarily involve moral turpitude, and often warrant the ultimate discipline—disbarment—when performed by attorneys in either a personal or professional capacity. (*In re Prantil* (1989) 48 Cal.3d 227, 234 [255 Cal.Rptr. 890, 768 P.2d 109]; *In re Bogart* (1973) 9 Cal.3d 743, 748-749 [108 Cal.Rptr. 815, 511 P.2d 1167].) Gossage stole from several victims over a nine-year period, betraying the trust of family and friends and stealing from at least one business, the Mark Hopkins Hotel. As a result, he was convicted of three counts of forgery in two cases prosecuted in two different counties, San Francisco and Marin. Probation was also revoked in both the San Francisco forgery case and the 1981 heroin possession case because Gossage continued to commit theft and forgery. (See *Hallinan, supra,* 65 Cal.2d 447, 462-463 [forgery and other deceitful crimes are proper grounds on which to deny admission].)

We therefore agree with the Committee that Gossage can be found morally fit to practice law only if the evidence shows that he is no longer the same person who behaved so poorly in the past, and only if he has since behaved in exemplary fashion over a meaningful period of time. This heavy burden is commensurate with the gravity of his crimes.

As further suggested by the Committee, similar considerations affect the manner in which the evidence is weighed in determining whether the requisite showing of rehabilitation has been made. (See *Hallinan, supra,* 65 Cal.2d 447, 451, approving *Zitny v. State Bar* (1966) 64 Cal.2d 787, 790 [51 Cal.Rptr. 825, 415 P.2d 521] [applicant benefits from any conflicting, equally reasonable inferences flowing from an established fact]; see also *Seide, supra,* 49 Cal.3d 933, 937 [reasonable doubts are resolved in applicant's favor].) ▓ Where serious or criminal misconduct is involved, positive inferences about the applicant's moral character are more difficult to draw, and negative character inferences are stronger and more reasonable. Likewise, numerous illegal and bad acts committed by the applicant cannot reasonably be viewed each in isolation, and instead suggest a pattern of antisocial behavior casting doubt on his moral character. (See *Menna, supra,* 11 Cal.4th 975, 986.) ▓ These principles make clear that Gossage has not demonstrated his rehabilitation from past misdeeds, and that his admission to practice law is therefore unwarranted.

**B.** *Gossage is not rehabilitated because he has continued to break the law and show poor moral character.*

At the outset, we note that the Review Department majority, in crediting Gossage with a 14-year period of rehabilitation between the time he decided to become sober in prison and the time he appeared at the hearing below, defined the notion of rehabilitation more broadly than our cases allow. ▉ Since persons under the direct supervision of correctional authorities are required to behave in exemplary fashion, little weight is generally placed on the fact that a bar applicant did not commit additional crimes or continue addictive behavior while in prison or while on probation or parole. (*Menna, supra,* 11 Cal.4th 975, 989; *Seide, supra,* 49 Cal.3d 933, 941.)[22] Similarly, good conduct generally is expected from someone who has applied for admission with, and whose character is under scrutiny by, the State Bar. (See *In re Giddens* (1981) 30 Cal.3d 110, 116 [177 Cal.Rptr. 673, 635 P.2d 166].) Thus, for our purposes, the relevant time frame falls between July 1984, when Gossage last completed parole, and January 1994, when he sought a moral character determination from the Committee.

At worst, Gossage's conduct during this time suggests a hopeless refusal or inability to conform to societal rules when considered in light of the moral turpitude and lawlessness he displayed over the preceding 10-year period. At best, any rehabilitative trend is not complete and the risk is still too high that he will disregard legal and ethical obligations if allowed to practice law. We reach this conclusion based on many factors not considered by the Review Department majority, as follows.

Gossage received four traffic citations in four different years between 1987 and 1991, each involving multiple and repetitive Vehicle Code violations to which he either pled guilty in court or effectively conceded guilt at the State Bar hearing. In two different years, he drove with a suspended license—sustaining separate misdemeanor convictions for each offense. In three different years, he drove without proper vehicle registration. In two consecutive years, he drove without evidence of financial responsibility. This pattern of offenses is reminiscent of the three drunk/reckless driving

---

[22]Gossage did not behave in exemplary fashion while on parole for the last time, as explained in footnote 3, *ante.* In addition to violating parole, Gossage abused Minervini's trust after promising to buy his car, and was successfully sued for civil damages as a result. In concluding that Gossage would have handled the Minervini matter differently if it had happened more recently, the Review Department majority appears to have begged the question to be decided. In any event, the Minervini incident does not play a significant role in our conclusion that Gossage is not rehabilitated and should not be admitted to the State Bar. We explain in the text that this outcome is justified by the many other unlawful and untrustworthy acts he committed since the time he last completed parole in 1984.

convictions Gossage sustained between 1978 and 1982—two of which were committed on probation or parole. All show disregard for the rules that protect and govern everyone who enjoys the privilege of driving a motor vehicle. (See Rules of Admission, rule X, § 1 [requiring "respect for and obedience to the laws of the state and the nation"]; see also *In re Kelley* (1990) 52 Cal.3d 487, 495-496 [276 Cal.Rptr. 375, 801 P.2d 1126][attorney disciplined for second DUI offense committed while on probation from first DUI offense].)

Also inconsistent with his claim of rehabilitation is that Gossage repeatedly broke the law in familiar ways when responding to the traffic citations issued against him. He did not appear in court as required by the citations he received and signed in 1987, 1988, and 1989. As a result, in 1990, he sustained three misdemeanor convictions under Vehicle Code section 40508, subdivision (a), for the "willful[ ]" violation of his promises to appear.[23] Gossage also twice failed to pay fines ordered by the court based on the same three sets of citations—once in 1990 and again in 1992. These fines were not fully paid until 1993—several years after the underlying driving offenses occurred. In the meantime, in 1992, Gossage sustained at least three misdemeanor convictions for the "willful[ ]" failure to pay traffic fines under Vehicle Code section 40508, subdivision (b).[24]

The six convictions suffered in 1990 and 1992 under section 40508 of the Vehicle Code, all based on his "willful[ ]" misconduct during a period of claimed rehabilitation, are similar to at least eight instances during the pre-rehabilitative period between 1973 and 1984, in which Gossage either failed to make court-ordered appearances or violated the court-ordered conditions of probation or parole. This pattern of misconduct suggests a conscious and habitual lack of "respect . . . for the judicial process." (Rules of Admission, rule X, § 1.) Indeed, we have stressed that "[d]isobedience of a court order, whether as a legal representative or as a party, demonstrates a lapse of character and a disrespect for the legal system that directly relate to an attorney's fitness to practice law and serve as an officer of the court." (*In re Kelley, supra*, 52 Cal.3d 487, 495.) The fact that Gossage has so recently

[23]Vehicle Code section 40508, subdivision (a) states: "Any person willfully violating his or her written promise to appear or a lawfully granted continuance of his or her promise to appear in court or before a person authorized to receive a deposit of bail is guilty of a misdemeanor regardless of the disposition of the charge upon which he or she was originally arrested."

[24]Vehicle Code section 40508, subdivision (b) states: "Any person willfully failing to pay a lawfully imposed fine for a violation of any provision of this code or a local ordinance adopted pursuant to this code within the time authorized by the court and without lawful excuse having been presented to the court on or before the date the fine is due is guilty of a misdemeanor regardless of the full payment of the fine after such time."

disobeyed court orders, and has sustained several new convictions for such conduct, indicates that meaningful rehabilitation has not occurred. These recent offenses are particularly ominous because they occurred after Gossage entered law school, when he presumably understood that such conduct was offensive and could jeopardize his ability to practice law.

Contrary to what Gossage claims and the Review Department majority found, nothing in his testimony negates or diminishes the unfavorable character inferences raised by the foregoing matters. For several reasons, we reject any suggestion that Gossage is less blameworthy because he never received notices to appear for multiple traffic citations issued in 1987 through 1989.

First, such a claim is inconsistent with the findings of the criminal courts, beyond reasonable doubt, that his failures to appear and pay fines were "willful[ ]." (See Pen. Code, § 7, subd. 1 ["willfully" implies "a purpose or willingness to commit the act, or make the omission referred to"].)

Second, it seems unlikely that all such notices were lost in the mail or were not otherwise delivered at several different residential addresses occupied by Gossage during this time. In fact, Gossage admitted having had no trouble receiving a letter from the DMV at one of the same locations in December 1991.

Third, Gossage acknowledged at the State Bar hearing that he was required to inform the DMV each time he changed his mailing address, and to provide a current address each time he received a traffic citation. To the extent he provided authorities with information which he knew or assumed was unreliable, his conduct fell below the standards generally followed by other drivers.

Finally, each citation received and signed in 1987 through 1989 required Gossage to report to the court with respect to the offenses listed therein. Any notice mailed to, but not received by, Gossage would have been cumulative to the extent it reminded him of his duty to appear.

In all other respects, the Vehicle Code violations are unmitigated and cast doubt on Gossage's present character. Gossage admitted that he responded in various improper ways to each traffic citation issued beginning in 1988, based on information possessed by or available to him at the time. For example, he took no action in response to the seat belt and suspended-license violations appearing on citations he received and signed in 1988 and 1989, respectively. He also had no reason to believe that mailing the court a certificate of nonoperation would cure the two registration violations appearing on the citation he received and signed in 1991. Similarly, notwithstanding any failure by the court to properly credit Gossage with $225 he

reportedly paid in 1990, his efforts to comply with orders imposing traffic fines in 1990 and 1992 were otherwise inadequate. No justification was offered, or is apparent, for this lapse. Based on his pattern of conduct, we infer Gossage willfully failed to discharge all legal requirements.

For the foregoing reasons, the evidence does not support the finding of the Review Department majority that Gossage behaved in a reasonable and appropriate fashion each time he failed to appear in traffic court and each time he failed to comply with court orders from 1987 through 1993. Unlike the majority, we conclude, based on the Vehicle Code offenses, that Gossage has not behaved in an exemplary manner since he last completed parole, that he is not fully reformed, and that he is not sufficiently trustworthy to practice law.

The defective Application Gossage filed with the Committee in January 1994 confirms this conclusion. As we explain, he has not acted with the "high degree of frankness and truthfulness" and the "high standard of integrity" required by this process. (*Spears v. The State Bar* (1930) 211 Cal. 183, 187 [294 P. 697, 72 A.L.R. 923].)

■ Admission has been denied where the applicant did not fully disclose his criminal history—information material to an accurate moral character assessment. (*In re Gehring* (1943) 22 Cal.2d 708, 709-712 [140 P.2d 413] [applicant for readmission omitted information about two theft arrests and about denial of a real estate license]; *In re Garland* (1934) 219 Cal. 661, 662 [28 P.2d 354][applicant for admission omitted forgery conviction and disbarment in another state].) Whether it is caused by intentional concealment, reckless disregard for the truth, or an unreasonable refusal to perceive the need for disclosure, such an omission is itself strong evidence that the applicant lacks the "integrity" and/or "intellectual discernment" required to be an attorney. (*In re Gehring, supra,* 22 Cal.2d at p. 712.) By the same token, no adverse effect on admission generally occurs where the applicant omits less crucial information, where the omission is the product of an innocent mistake, and where the application is otherwise complete. (E.g., *Lubetzky v. State Bar* (1991) 54 Cal.3d.308, 318-319 [285 Cal.Rptr. 268, 815 P.2d 341] [applicant inadvertently omitted from a subsequent application information about a civil lawsuit that had appeared on an earlier application]; *Hallinan, supra,* 65 Cal.2d 447, 473 [applicant inadvertently omitted a probate matter and a civil protest citation, but otherwise provided complete information about arrests, convictions, and crimes].)

■ Even assuming all other defects are insignificant and excused, the criminal history information missing from the Application created a materially false impression about Gossage's past and present moral character.

Gossage did not disclose two of his five felony convictions—the forgery conviction entered in 1973 involving his mother's checks in San Francisco, and one of two forgery convictions entered in 1974 involving his grandmother's checks in Marin County. These omissions substantially reduced the number of crimes involving moral turpitude that should have appeared on the Application. Also, except for the 1982 Presidio DUI conviction, Gossage omitted all misdemeanor convictions he sustained before he was imprisoned for the last time in 1982. Since all three of the omitted items in this group involved drunk/reckless driving and public intoxication, the Application failed to fully convey his propensity to disregard traffic and public safety laws during this time. Finally, Gossage withheld from the Application all eight misdemeanor convictions based on Vehicle Code violations committed between 1987 and 1993. Nothing in the Application thus conveyed the lawbreaking that continued to occur after Gossage was last released from prison.

We reject as implausible Gossage's testimony suggesting that he omitted two of his three forgery convictions as the result of poor memory. It seems unlikely that a reasonable person would forget any felony convictions, much less the very first one he obtained for an incident which he otherwise recalled (i.e., the 1973 forgery conviction in San Francisco). Also, while Gossage remembered and disclosed the fact that he had been convicted of forgery in Marin County, he failed to mention that he was found guilty on two counts in that case, even though the Application requested such discriminating information. Any implication that he forgot the second Marin County forgery conviction is suspect in light of testimony by defense counsel Grim, indicating that he conveyed this information to Gossage when they talked about the Application.

For similar reasons, we discount Gossage's testimony insofar as he sought to excuse his failure to disclose three misdemeanor convictions sustained for drunk/reckless driving and public intoxication between 1978 and 1981. Business partner Barbe testified at the State Bar hearing that, in 1991, Gossage admitted that he had been involved in, and arrested for, multiple drunk driving and drug-related incidents as a young man. Since this revelation occurred not too long before Gossage applied for admission, the exclusion of all but one drunk driving conviction from the Application seems suspicious and purposeful.

At a minimum, the evidence indicates that Gossage knew he had sustained more criminal convictions than the few he disclosed, that he refused to perform the work required to report all criminal matters, and that he failed to appreciate the need to provide such information. As explained, the Application sought disclosure of all felony and misdemeanor convictions, including

those based on minor traffic incidents. The instructions also required attachment of specified supporting documentation. Gossage declared under penalty of perjury that he had fulfilled all such requirements and that he had answered all questions truthfully and completely.

Nevertheless, Gossage made clear at the State Bar hearing that he failed to take reasonable steps to ensure that his answers in this section of the Application were accurate and complete. Thus, while he cited no basis on which to believe that the Vehicle Code offenses committed between 1987 and 1993 were mere unreportable infractions, he took no action to verify this assumption. He also took no action to learn about convictions obtained in Bay Area counties other than San Francisco. Moreover, the few inquiries Gossage made with respect to his many San Francisco convictions were half-hearted—declining to read the "rap sheet" carefully, relying on Attorney Grim's limited recall, and reviewing the empty court file in only one matter (i.e., the voluntary manslaughter case). The foregoing behavior is similar to the manner in which Gossage repeatedly ignored and mishandled Vehicle Code citations and related court orders between 1987 and 1993. Again, we infer Gossage cannot be trusted to appreciate and fulfill his legal responsibilities.

Contrary to what the majority of the Review Department found, the unusual severity and scope of Gossage's criminal record strengthened—not lessened—his obligation to ensure the accuracy of his Application even if independent research was required. Indeed, it is conceivable that all 17 felony and misdemeanor convictions he received in three different counties over a 20-year period otherwise might not have come to the Committee's attention. To excuse defective preparation of the Application under these circumstances would set a dangerous precedent—encouraging the worst criminal offenders to make the least effort in complying with the disclosure requirements on State Bar applications. In a related vein, we refuse to assume that Gossage or any other applicant in his position cannot reasonably be expected to discover and provide the necessary information. More rigorous intellectual tasks are often performed by attorneys in the practice of law.

Unlike the majority of the Review Department, we place little weight on any effort by Gossage to supply the missing criminal history information after he first sought a moral character determination and before the formal evidentiary hearing occurred.[25] While an application is pending and until admission occurs, all candidates have a "continuing obligation to keep their

---

[25]In October 1994, 10 months after he filed the Application, Gossage appeared without counsel at an informal conference with the State Bar's Subcommittee on Moral Character. According to the transcript of this interview, Gossage disclosed—apparently for the first time—that he had been "ticketed for not having registration" on "five or six" occasions, and

applications current and must update responses whenever there is an addition to or a change to information previously furnished the Committee." (Rules of Admission, rule VI, § 7.) Any adherence by Gossage to this requirement while the Committee processed his Application and investigated his moral character does not purge his failure to provide all necessary information in the first place.

## IV. CONCLUSION

Gossage was found guilty of an intentional criminal homicide and other felonies involving moral turpitude. He therefore faced a heavy burden of proving his own rehabilitation—a burden he has not sustained. We are mindful of Gossage's recovery from substance abuse, his academic achievements, and his community involvement between July 1984, when he was last discharged from parole, and January 1994, when he applied for a moral character determination with the Committee. However, as evidenced by the Vehicle Code offenses committed between July 1987 and June 1993, and by the misleading Application filed in 1994, Gossage disregarded his legal obligations and the responsibilities he would undertake as a member of the State Bar. In order to safeguard the public and protect the integrity of the profession, we cannot conclude Gossage has established his present good moral character. We therefore reject the State Bar Court's recommendation and decline to admit Gossage to the practice of law.[26]

---

that his "license had been suspended because [he] hadn't taken care of the registration tickets." Additional information about recent Vehicle Code violations and about all other criminal convictions not originally reported on the Application subsequently came to light after Gossage appeared through counsel in the present case. The record contains letters from counsel to the Committee describing such offenses in relative detail.

[26]The Committee asks that we take judicial notice of a 1985 unpublished decision of the State Bar Court declining to recommend admission of another applicant on moral character grounds, and of this court's ensuing order denying a writ of review. Because the unpublished materials have no direct bearing on the circumstances underlying our decision in the present case, we decline to exercise our discretion in the manner urged by the Committee. (See generally *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1178, fn. 37 [81 Cal.Rptr.2d 492, 969 P.2d 584].) Hence, the request for judicial notice is denied.