Filed 1/27/14

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |
|---|---|
| ) | |
| ) | S196374 |
| In re STEPHEN RANDALL GLASS on Admission. ) | |
| ) | State Bar Ct. |
| ) | No. 09-M-11736 |
| _____ ) | |

**THE COURT.**\*

Stephen Randall Glass made himself infamous as a dishonest journalist by fabricating material for more than 40 articles for The New Republic magazine and other publications. He also carefully fabricated supporting materials to delude The New Republic's fact checkers. The articles appeared between June 1996 and May 1998, and included falsehoods that reflected negatively on individuals, political groups, and ethnic minorities. During the same period, starting in September 1997, he was also an evening law student at Georgetown University's law school. Glass made every effort to avoid detection once suspicions were aroused, lobbied strenuously to keep his job at The New Republic, and, in the aftermath of his exposure, did not fully cooperate with the publications to identify his fabrications.

---

\* Cantil-Sakauye, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., Corrigan, J., and Mosk, J.†

---

†Associate Justice, Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

1

Glass applied to become a member of the New York bar in 2002, but withdrew his application after he was informally notified in 2004 that his moral character application would be rejected. In the New York bar application materials, he exaggerated his cooperation with the journals that had published his work and failed to supply a complete list of the fabricated articles that had injured others.

Glass passed the California bar examination in 2006 and filed an application for determination of moral character in 2007. It was not until the California State Bar moral character proceedings that Glass reviewed all of his articles, as well as the editorials The New Republic and other journals published to identify his fabrications, and ultimately identified fabrications that he previously had denied or failed to disclose. In the California proceedings, Glass was not forthright in acknowledging the defects in his New York bar application.

At the 2010 State Bar Court hearing resulting in the decision under review, Glass presented many character witnesses and introduced evidence regarding his lengthy course of psychotherapy, along with his own testimony and other evidence. Many of his efforts from the time of his exposure in 1998 until the 2010 hearing, however, seem to have been directed primarily at advancing his own well-being rather than returning something to the community. His evidence did not establish that he engaged in truly exemplary conduct over an extended period. We conclude that on this record he has not sustained his heavy burden of demonstrating rehabilitation and fitness for the practice of law.

## I. FACTS

### A. *Committee of Bar Examiners' evidence*

Stephen Glass was born in September 1972, in a suburb of Chicago, Illinois. After early success as a journalist in college and a developing interest in the law, in 1994 Glass was admitted to New York University Law School but

deferred his intended legal training to accept a position in Washington, D.C. with Policy Review magazine.

In September 1995 Glass accepted a position at The New Republic magazine. In early June 1996 he began fabricating material for publication. The fabrications continued and became bolder and more comprehensive until he was exposed and fired in May 1998.

Glass's fabrications began when an article entitled *The Hall Monitor* was published containing a fabricated quotation from an unnamed source disparaging United States Representative Pete Hoekstra for behaving in Congress like an elementary school "super hall monitor." He started by fabricating quotations or sources, and ended by publishing wholesale fictions. He testified that "all but a handful" of the 42 articles he published in The New Republic contained fabrications or were entirely fabricated. He also routinely prepared elaborate reporter's notes and supporting materials to give the false impression to the magazine's fact checkers that he had done all the background work for each article and that his informants had spoken words he falsely attributed to them.

Glass testified at the State Bar Court hearing that he "wrote nasty, mean-spirited, horrible" things about people: "My articles hurt, and they were cruel . . . ." He testified that the fabrications gave him "A-plus" stories that afforded him status in staff meetings and also gave particular enjoyment to his colleagues. He said: "Overwhelmingly, what everyone remembers about my pieces are the fake things."

A notable 1996 article was entitled *Taxis and the Meaning of Work*. It was Glass's first cover article and one he viewed as "key" to his successful period of writing for The New Republic. Its theme was that Americans, and in particular, African-Americans, were no longer willing to work hard or to take on employment they consider menial. The article falsely recounted as factual a supposed

3

encounter between Glass and three entirely fabricated characters, one a limousine driver, one a taxi cab driver, and one a criminal. The limousine driver was depicted as an African-American man who had driven a cab at one time, but now drove a limousine instead because he was "sick of those curry people" and found that limousines attracted beautiful women, or, in the purported words of the driver, gave him "the woo quotient." The author went on to say that he had been permitted to ride along for journalistic purposes with a taxi driver of Middle Eastern descent. The article recounted that the driver stopped for a young African-American passenger — "the type of fare Imran would normally refuse" but felt he had to accept because of nearby police observation. The article describes the pounding music audible from the young fare's headphones, and claims that as they neared his destination, the young African-American man threatened the driver with a knife, hurled coarse abuse at him, and took his wallet. According to the article: " 'These things happen,' Imran said coldly on the drive back downtown. 'I give them whatever they want. I just want my life.' "

*Spring Breakdown*, published in March 1997, was another example of Glass's fabrications. The theme of the article was that young, conservative Republicans had given up on electoral politics and had turned to drugs and sex. Glass invented a fictional group of male college students attending the Conservative Political Action Conference. To convey the young men's view that conservatives had lost their direction, he attributed to one of them the comment that conservatives were " 'like a guy who has to pee lost in the desert, searching for a tree.' " Glass described the young men using marijuana for an hour, then embarking on a search for a young woman to humiliate. The plan was "to choose the ugliest and loneliest they can find," a person the young men described as "a real heifer, the fatter the better, bad acne," for a few of them to lure to their hotel room and persuade to undress. At that point, the remaining men would emerge

4

from under the bed, shout " 'we're beaching.  Whale spotted!' " and photograph the woman.  After turning to a discussion of asserted losses in popularity experienced by the conservative movement, the article went on to recount the execution of the plot described above.  It asserted that a woman in fact emerged from the young men's room unclothed and in tears, while the perpetrators congratulated each other.  The article went on:  "This repellent scene was only a little beyond the norm of the conference.  A wash of despair and alcohol and brutishness hung over the whole thing."  More examples of drug use ensued, along with examples of shameless sexual behavior.  All of this was fabricated.

In another article, entitled *Deliverance*, published in November 1996, Glass recounted receiving unsatisfactory service from a named computer company, and claimed that his complaints to a telephone customer service representative were met with an anti-Semitic slur.  In truth, no such slur ever was uttered.  Glass also wrote a letter to the president of the company, repeating the accusation, and sent a copy to the Anti-Defamation League.

Glass also engaged in fabrications in freelance articles published by other magazines.  An example was *Prophets and Losses*, an article published in Harper's Magazine in February 1998, at which time Glass was also a law student.  In that article, Glass represented that he had worked for a telephone psychic service for a time, and recounted fabricated conversations with management, represented as mercenary and either stupid or cynical, and also fabricated conversations with callers, who were depicted as ignorant and desperate.  In one case a caller, a fabricated character to whom Glass had attributed an African-American dialect, could not be persuaded to use his money to feed and clothe his seven children by five different mothers instead of buying VCRs and calling telephone psychics for advice on lottery numbers.  The article was almost entirely a fabrication.  Glass explained at the hearing that his intent was to expose "how

5

the telephone psychic industry preys on minorities . . . .  It uses minority celebrities to advertise and shows that are watched predominantly by minorities to lure them into paying insane amounts of money.  [¶]  I was angry about that, and I wanted to attack that, and I used terrible, horrible stereotypes to create, essentially, straw men to knock down.”

In another example, Glass wrote an article entitled *The Vernon Question* for George magazine.  The lengthy article, published in April 1998, concerned Vernon Jordan, an advisor to then-President Clinton during the then-emerging Monica Lewinsky scandal.  In two paragraphs, Glass used nonexistent sources to describe Jordan’s supposed reputation as a “boor” and attributed various fictitious statements to “political operatives,” “socialites,” “political hostesses” and officials.  These persons assertedly stated that Jordan was well known for sexually explicit comments, unwanted sexual advances, and crude stares, and added that he was known in their circles as “Vern the Worm” or “Pussyman,” and that young women needed protection against him.  Another paragraph attributed to a fictional “watchdog” group contained certain claims about Jordan’s asserted conflicts of interest and questionable corporate ethics along with statements attributed to fictional “senior officials” at companies on whose boards Jordan sat, saying that Jordan is “totally unaware of the issues” but “we get what we want, access, and he gets what he wants, cash.”  These were all fabrications.

Charles Lane, who was the editor of The New Republic at the time of Glass’s exposure, testified for the Committee of Bar Examiners (hereafter sometimes Committee) that he had received an early complaint about Glass concerning an article entitled *Boys on the Bus*, depicting the actor Alec Baldwin and his brother as silly celebrities whose efforts during a bus tour to campaign on the issue of campaign finance reform were based on ignorance.  A representative of Baldwin’s disputed the assertion in the article that the actor had been giving out

6

autographs during the bus tour, but Glass repudiated the accusation in print in The New Republic.  It wasn't until Glass prepared his application to the California State Bar that he acknowledged that this article contained fabricated evidence to the effect that interest in the bus tour came from movie fans seeking autographs and referred to a fabricated person who opined that Baldwin lacked real understanding of campaign finance reform.

Although at the time, the *Boys on the Bus* incident seemingly was resolved in Glass's favor, Lane's suspicions were aroused in May 1998 when a journalist employed by Forbes Digital Tool telephoned to warn him that factual assertions in Glass's recent article for George magazine, *Hack Heaven*, did not seem to be true. The article had described a teenager hacking a California software company and extorting money to stop the intrusion.  The article described a convention in Bethesda, Maryland where some of the events occurred, and when Lane challenged Glass, the latter journeyed with Lane to Bethesda, purporting to identify the building where the convention had been held.  A person working in the building denied such a convention had occurred, and Lane became persuaded that Glass was lying.  Lane pressed Glass about the factual basis for the article, and although Glass was evasive, he insisted the article was accurate.  Glass spent the night at home fabricating what he would assert were his reporter's notes from interviews, fake business cards, a voicemail box, a Web site, and newsletters.  He also induced his brother to impersonate a source.

Upon their return to the office from Bethesda, Glass lobbied the executive editor and others to intervene on his behalf with Lane, urging that he was being treated unfairly.  Lane, now suspecting that other fabrications may have occurred, wanted to fire him, but in response to the lobbying, suspended him.  The next day, a Saturday, Lane was surprised to discover Glass at the office.  Thinking Glass had been told not to return, Lane suspected he had altered his computer files.  He

confronted Glass with evidence that Glass had used his brother as a false source in the *Hack Heaven* piece. Ultimately, during this exchange Glass admitted the article was fabricated, and Lane fired him. Lane found on Glass's desk a letter Glass had written to his landlord, falsely stating he had been transferred by The New Republic to New York, and needed his security deposit refunded. Lane also found the letter Glass had written to the chief executive of Gateway computers, again stating the falsehood that a customer service employee had used an anti-Semitic slur against Glass.

Lane reviewed all of Glass's articles over the course of the following three or four weeks. He received a letter from Glass apologizing and saying he had instructed his lawyers to cooperate with The New Republic. Lane compiled a summary of the material in Glass's articles that he found suspicious and submitted the summary to Glass's counsel, who it was agreed would stipulate to those findings of Lane's that Glass believed to be correct. At the time, Lane concluded that 27 of the 42 articles Glass had written for the magazine contained fabrications, and Lane wrote two editorial articles informing the magazine's readership to this effect.

Lane was very surprised to learn for the first time in the California State Bar proceeding that there were four articles Glass identified in his California bar application as fabrications that he, Lane, had not even suspected were flawed. Lane was also surprised that four of the articles he had identified to Glass's counsel as suspicious, but which Glass had declined to stipulate contained fabrications, were now admitted in the California State Bar application to involve fabrications — including the disturbing *Taxis and the Meaning of Work*, along with *Deliverance*, with its false claim of anti-Semitism, and *Boys on the Bus*, which had involved the magazine in a dispute over authenticity even before Glass's exposure.

8

Lane testified that he thought Glass had perpetrated an elaborate hoax on readers and was engaged in a con game, not journalism. He testified that Glass's case had been highlighted at the Newseum, a Washington D.C. museum of journalism, as one of the worst examples of misconduct in journalistic history. Lane noted that The New Republic was put to the expense of hiring a private investigator to analyze Glass's articles and incurred legal fees in the tens of thousands of dollars. He testified that Glass had not offered him reimbursement for the magazine's expenses, nor did he offer to refund any portion of the salary he had been paid. Lane added that the fabrications hurt the magazine's reputation, relationships between employees, and of course hurt those maligned in the articles. Lane was not mollified by a letter of apology he received from Glass in August 2003, around the time Glass's novel, The Fabulist, was published. Lane considered the letter fawning. Lane considered Glass "flagrantly incapable of producing honest journalism," and concluded that his record of systematic deception and lack of thorough confession made him unemployable as a journalist.

Richard Bradley, who was Washington affairs editor for George magazine and Glass's editor for his freelance articles for that magazine, testified on behalf of the Committee. Bradley stated that when he learned of the scandal involving Glass at The New Republic, he investigated the background for the three freelance articles Glass had published, as well as a fourth article that Glass had submitted and that was being edited. On investigation, the article on Vernon Jordan "blew apart like a dandelion in a strong wind." Assertions in the other articles were difficult to substantiate. When, within a week of learning there were problems with Glass's work, Bradley contacted Glass for help in identifying problems in the articles, Glass responded that he was psychologically incapable of doing so and that he was suicidal, and hung up. The magazine published an editorial indicating that significant portions of the Vernon Jordan article appeared to be false, and that

9

fabrications were woven into reliable reporting so that it was difficult to distinguish them. Glass never contacted Bradley to tell him what was true or false in his articles in George magazine, nor was Bradley contacted by Glass's lawyer. (Glass did send a letter of apology to the magazine's editor-in-chief.) Bradley believed that Glass had discredited journalism, contributing to the misconception that journalists are "craven and dishonest." Bradley commented that Glass's articles "caricatured and mocked their subjects . . . and I felt that the perceptions promoted by [Glass's] fabrications, in these examples [of] African-American people and conservatives, could not be corrected as easily as a factual mistake could be." Because he would not be credible, Bradley would not hire Glass as a journalist.

Joseph Landau, who later became a law professor at Fordham University Law School, was a fact checker at the New Republic while Glass worked there. He testified that Glass had a superior reputation for accuracy among fact checkers because his notes were so thorough and he was apparently so forthcoming, but he tended to push the fact-checking process to the last minute so that it was rushed and could not be done face-to-face. At times Glass could not verify certain facts but would promise Landau to telephone the source. Glass would soon return with confirmation and updated material, a process that reaffirmed the witness's sense that the fact checking was working. Landau had trusted him. Landau received a letter of apology from Glass in the summer of 2004, some six years after Glass had been exposed, and found it to be general and vague.

Louis Miller, a lawyer and chairperson of the board of DARE (Drug Abuse Resistance Education), testified that Glass published falsehoods in articles in The New Republic in March 1997 and Rolling Stone in March 1998 that impaired the organization's reputation, because the articles claimed DARE was ineffective. According to Miller, the articles contained fabricated "evidence" that the

10

organization had engaged in a widespread campaign of heavy-handed and even violent criminal tactics to counter academic and journalistic criticism of the program. DARE sued Glass for libel and settled after Glass agreed the challenged information was fabricated, issued a retraction, and paid the organization's legal expenses of between $25,000 and $50,000. DARE did not receive a letter of apology from Glass before it filed suit. DARE sued Rolling Stone for defamation but lost on the ground that DARE had failed to establish actual malice.

Glass graduated from law school in 2000, when he also took and passed the New York bar examination. He applied to become a member of the New York bar in 2002. After an evidentiary hearing before a subcommittee of a Committee on Character and Fitness, and pursuant to apparent custom, in September 2004, a representative of that committee informed Glass informally that his application would be rejected, so he withdrew it. The record does not disclose the reason for the tentative decision.

In his application to the New York bar, Glass described his misconduct and firing. His application and supporting materials included only 20 articles containing fabrications. Glass wrote that he had apologized to the editor of The New Republic, saying "I also worked with all three magazines [referring to The New Republic, Harper's, and George magazines] and other publications where I had written freelance articles to identify which facts were true and which were false in all of my stories, so they could publish clarifications for their readers."

At the hearing, Lane challenged the quoted statement as untrue. Lane believed that Glass had failed to come forward to actively assist The New Republic in identifying his fabrications, and instead had placed the entire burden of identifying his errors on Lane. Lane testified: "Well, he didn't work with us. The effort we went through, over the course of nearly a month, to investigate all those stories would have been unnecessary if he had worked with us, and simply

11

come forward and laid bare everything that was untrue in his stories. Instead, he sought legal counsel and, in effect, clammed up. [¶] . . . [W]hen I read the statement that he's laid out in this proceeding, I discovered that, even to this day, he has not — or had not — come clean about everything. So I'm a little amazed to see that he was representing to somebody that he worked with The New Republic to separate fact from fiction in his articles. That was definitely not my experience."

### B. Applicant's evidence

According to Glass, during his childhood and young adulthood his parents exerted extremely intense and cruel pressure upon him to succeed academically and socially. Glass felt that The New Republic offered an extremely competitive atmosphere and that his journalistic efforts there failed to make a mark sufficient to ensure his retention after his year term had elapsed. It was after a visit to the family home, when his parents berated him for his apparent failure even in what they considered the worthless career of journalism, that he began fabricating material for publication. He also fabricated reporters' notes and supporting materials for his articles. His aim was to impress his parents and colleagues.

Once he was fired from The New Republic, Glass was distraught, suicidal, and unable to focus, almost immediately entering therapy. He nonetheless hired counsel whom he directed to "work with The New Republic." Glass testified that he believed that The New Republic wanted to conduct its own investigation because it did not trust him and testified that "I came to understand that they were going to provide me with a list of [fabricated] articles, and that I was to affirm whether or not the article was fabricated that they showed me or that they listed." He had fabricated more than The New Republic had discovered in its investigation, although he testified that due to his distress he did not realize this when he reviewed the list or later when he glanced at The New Republic's

12

editorials listing his fabrications.  Four of his articles containing fabrications were not on the list and he had erroneously denied there were fabrications in four articles that were on the list, including *Boys on the Bus*, *Deliverance*, and *Taxis and the Meaning of Work*.  He did not read the editorials — incomplete, as it turned out — that Lane published listing his fabricated articles.  In fact, he closely read those articles for the first time when the California State Bar asked him to list all of his fabricated articles.  Glass testified that he had "no information" indicating that his lawyers had failed to convey information to The New Republic.

Glass did well in law school.  Within a few days of his firing, he rescheduled an exam and within a week, managed to earn a B-plus grade on an exam.  He explained, however, that this was a poor grade for him.

Members of Georgetown University's law school faculty testified on his behalf at the hearing.  Professor Susan Bloch telephoned him when the scandal first broke and asked if he needed someone to talk to.  She appointed him as her research assistant, praising him as one of the brightest and best workers she ever had encountered.  She found him to be honest and developed complete trust in him.  She recommended him for a judicial internship during law school and a clerkship after graduation.  Bloch maintained friendly contact with Glass over the years, including after he moved to California, and testified on his behalf when Glass applied for admission to the New York bar.  She testified that she believed Glass had learned from his wrongdoing, that the trauma of his exposure would keep him from ever repeating such behavior, and that she had never observed any dishonesty on his part.  She did not read his fabricated articles but was generally aware of their content.

Professor Stephen Cohen, also of the Georgetown law school, testified that Glass took full responsibility for his misconduct.  They became friends and Glass was a welcome visitor with Cohen's family.  Cohen believed Glass would be

13

honest and ethical as an attorney; in sum, he believed Glass to be fully rehabilitated. Cohen deemed it "presumptuous" and "offensive" when counsel for the Committee of Bar Examiners asked him whether the Georgetown law school application should be read to have required Glass to notify the school that the journalistic honors he listed in his application may have been based in part on fabricated journalism.

In 2001, at the end of his clerkship, Glass moved to New York to be with his girlfriend, and underwent psychoanalysis on a four-day-a-week basis. In June 2001 Glass entered into a contract to write a novel based on his experiences at The New Republic, testifying that his psychiatrists advised him that it would be therapeutic to write the book, which he hoped would serve as a warning to young journalists. He was paid an advance of $175,000 and sold subsidiary rights for $15,000. He wrote the novel, The Fabulist, and appeared on the television program *60 Minutes* in May 2003 (just prior to the date of publication) to discuss his experiences. He claimed that it was not his intent to use the appearance to sell his book, but rather to offer a public apology.

During his residence in New York, and mostly between 2001 and 2004, Glass also undertook to handwrite approximately 100 letters of apology to journalists affected by his fabrications, as well as to the persons who were injured by his articles. He also spoke at a journalism forum at George Washington University in 2003, where he was loudly berated by other journalists. He spoke at a journalism class at Columbia and to a civics organization for high school students. In addition, he worked at a senior center on a regular basis for approximately one year in New York.

Concerning the questions that had arisen about the accuracy of his New York bar application, specifically his assertion that he had "worked with" the affected magazines "to identify which facts were true and which were false in all

14

[his] stories, so they could publish clarifications," Glass testified that perhaps he should have written that he " '*offered* to work with all three magazines,' " or in fact, that he " 'offered to work . . . *through counsel*,' " but added that he did not intend to make any misrepresentation or exaggeration. He testified that he assumed his lawyer had contacted George magazine, as Glass had instructed him to do, and that he did not prepare a list of fabrications for George magazine. He explained that he attached to his New York bar application the editorials The New Republic had published incompletely listing his fabrications, but he did not read them, or at least did not read them carefully at that time. He also attached the notice that George magazine had published about his work — an article that did not refer to two of his three articles for George that contained fabrications. He reviewed these carefully for the first time in preparation for the California State Bar hearing.

When asked at the hearing in the present matter whether it would be accurate to say that he offered to work with The New Republic to identify which facts were true and which were false in all of his stories, he answered "I believe that was my intention at the time, yes, and I believe I tried to do that." He explained that what he meant by this was that he asked his counsel to offer to go through the articles to identify fabrications, and then a "joint defense agreement was entered into, proposed by The New Republic, and we entered into a joint defense agreement that constructed this system."

Similarly, Glass explained, he did not actually undertake any work with Harper's Magazine to identify what was true and what was false in his articles, but "offered to work with them, or asked counsel to offer." He did not "have a memory of asking" his attorney whether counsel had contacted Harper's. When asked whether, when he prepared his New York bar application, he noticed or was troubled by the absence of any article from Harper's about his fabrications, he

15

testified that he still assumed counsel had offered to exchange information or to enter into an agreement with Harper's. When pressed on his failure to confirm counsel's contact with Harper's, he testified: "I confirmed — well in my head I asked [counsel] to do something and he didn't tell me otherwise, I believed it to have occurred."

Concerning his decision to list only 20 articles containing fabrications in his New York bar application materials, Glass emphasized that he had not been asked for a complete list of articles containing fabrications, but rather in a telephone conversation, an employee of the Committee on Character and Fitness asked for "a list of articles that contained a statement about a real person or real entity, as opposed to a fake person or a fake entity, that reflected something negative upon that real person or real entity." He wrote a letter to that committee memorializing this telephone conversation, saying he had been asked to list instances in which his fabrications "had a harmful impact on real persons. In response, I've gone back through all of my articles to identify those in which potentially harmful false statements were made about actual persons and actual organization," and also warning that there might be inadvertent omissions. He did not list *Deliverance*, *Boys on the Bus*, or an article concerning Ted Turner entitled *Gift of the Magnet*, although these contained fabrications. He explained at the California hearing that the customer service agent to whom he attributed the anti-Semitic slur in *Deliverance* was a "made-up character," and so, he insisted, the article did not harm a real person. When pressed, he admitted that the article could have caused harm to the customer service agent the company determined had assisted him, and to the company.

Similarly, he did not include the *Boys on the Bus* article in his New York bar materials because the person to whom he attributed the statement that Alec Baldwin did not know much about campaign finance reform was fake, and he had

16

created some "fake fans." When asked whether the article harmed Alec Baldwin, a real person, he responded that "Alec Baldwin, truth be told, did not know much about campaign finance reform." When pressed, he conceded that there was a potential for injury to Baldwin.

Glass testified that he moved to California in the fall of 2004. He was hired by the Carpenter, Zuckerman and Rowley law firm as a law clerk. The firm has many homeless clients, and in addition to the legal work he does on their cases, he has helped them with their personal problems, even with regard to matters of personal hygiene.

Originally Glass undertook volunteer work in Los Angeles, but because his law firm encouraged him to stop taking time off during the work day, he arranged to work extra hours for deserving clients on matters for which his firm had no expectation of collecting fees.

California attorney Paul Zuckerman testified that he decided to give Glass a chance as a law clerk. After initially assigning Glass minor projects and exercising close oversight, Zuckerman became convinced that Glass was one of the best employees in the firm, with a fine intellect, a good work ethic, and reliable commitment to honesty. Glass exhibited great compassion, assisting at a personal level with difficult clients and helping to find resources and social services for some of the firm's many homeless clients. Other lawyers who had worked for or with the firm confirmed Zuckerman's view of Glass as an employee who conducted excellent legal research, was assiduous and hyper-scrupulous about honesty, and stopped to think about ethical issues.

Also offered in support of Glass's application were affidavits that had been submitted in support of his New York bar application from the judges for whom Glass had worked during and immediately after completing law school. Both found him highly competent and honest at that time. Additional declarations from

17

attorneys and friends that had been submitted with the New York bar application were offered in support.

Dr. Richard Friedman, a psychiatrist, testified that he had treated Glass since 2005, and believed he had developed good judgment, scrupulous honesty, and the ability to handle difficult situations well. Dr. Friedman reported that he would be astonished if Glass committed misconduct as he had in the past, both because of the growth of character and moral sense the doctor had observed, but also because of a strong instinct to protect himself from the traumatic results of his prior misconduct. He reported that Glass had no sociopathic personality traits.

Dr. Richard Rosenthal, a psychiatrist and psychoanalyst who is known for treating gamblers and those with impulse control disorders, was approached by Glass's attorney in 2005. Rosenthal had an evaluative as well as therapeutic relationship with Glass that began in 2005 and continued with meetings once or twice a month until the time of the hearing.

Dr. Rosenthal identified Glass's underlying psychological issues as a need for approval, a need to impress others, and a need for attention, and pointed also to Glass's fear of inadequacy, rejection, and abandonment. Rosenthal testified that when they met in 2005, Glass needed to overcome enormous shame and learn to forgive himself. Through therapy, Glass learned to be realistic about family issues and to set boundaries. Rosenthal believed that Glass had grown up in a family that exerted tremendous pressure on him to succeed yet always made him feel like a failure. In Rosenthal's opinion, Glass was rehabilitated, meaning that he was extremely conscientious and honest, avoided the appearance of impropriety, had reasonable goals and expectations, had gained empathy and tolerance, and would not allow himself to be overwhelmed by stress. The doctor saw no evidence that Glass was a sociopath.

Glass himself described his therapy, which had commenced very shortly after his exposure and continued to the time of the 2010 hearing, that is, for 12 years. Through therapy he had learned to separate his feelings about his family from the work environment and to "set boundaries within my family." He testified that he believed the most important thing he could do to make amends was to change himself.

Martin Peretz, who owned and managed The New Republic at the time of the fabrications, testified on Glass's behalf and had developed a charitable view of his misconduct by the time of the California State Bar hearing. He blamed himself and, even more, the magazine's editors for encouraging Glass to write zany, shocking articles and for failing to recognize the improbability of some of Glass's stories. He found the harm of the scandal to the magazine to be minimal. He had renewed social contact with Glass in the past few years and believed that Glass had been harshly treated. He would not rule out hiring Glass again as a journalist. He explained that in his experience as a professor "[t]he most brilliant students plagiarize," complaining to the Committee's counsel, "I actually find your pursuing him an act of stalking."

Additional character witnesses included Melanie Thernstrom, a journalist, memoirist, and friend who testified that she had known Glass for more than a decade because she was a close friend of his girlfriend, Julie Hilden. Her initial skepticism about him dissolved soon after she met him and she believed he had become kind, generous, loyal, responsible, empathetic and above all, honest. Thernstrom witnessed Glass during the period he wrote letters of apology and said that each letter required considerable work and caused him anguish. She found him to be very sorry for the deceptions, and believed that he had taken responsibility for his past acts and would never deceive again. She had observed that Glass was intelligent, hardworking, and empathetic with clients who were

19

injured. She thought the Committee was "picking on" irrelevant issues — that is, the exact number of Glass's deceptive articles and whether or when he had disclosed them all. She believed the Committee's position was "sophistic." In her view, it was enough that he had admitted his misconduct and apologized for it, and she believed that there was no current, ongoing damage from his fabricated articles because Glass's work had been entirely discredited.

Lawrence Berger, a friend, testified on Glass's behalf, saying that Glass immediately told him about the scandal when they met. He testified that Glass is especially committed to being a good person now, being remarkably ethical and a devoted friend. According to Berger, Glass's efforts during the period he wrote the letters of apology were never perfunctory.

Julie Hilden, a freelance lawyer and aspiring scriptwriter and Glass's longtime live-in girlfriend, also testified on his behalf. He took good care of her during a prolonged, serious illness, even though she lived in New York and he was completing law school and doing his clerkship in Washington, D.C. at the time. She testified that he immediately demonstrated that he was very serious about being completely honest in every detail, and honesty is still an overriding concern. She observed the great effort he put into writing letters of apology during a prolonged period between 2002 and 2004. She explained that he takes a personal interest in clients, works very hard for them, and accepts their telephone calls at all hours, including nights and weekends.

### C. California State Bar proceedings

Glass took and passed the California Bar Examination in 2006 and in July 2007 filed an application for determination of moral character as part of his bar application. The Committee of Bar Examiners denied the application, but on Glass's request a moral character hearing was conducted in the State Bar Court in April and May of 2010.

20

The State Bar Court's hearing judge found that Glass had established good moral character. The Committee sought review. The State Bar Court Review Department independently reviewed the record (Cal. Rules of Court, rule 9.12), and a majority of the three-judge panel agreed with the hearing judge that Glass had established good moral character.

The Review Department majority acknowledged that Glass's misconduct had been "appalling" and "egregious," but believed that Glass had satisfied his "heavy burden of proof" and established his rehabilitation. The majority stated that Glass's burden of proof as a first-time applicant was "substantially less rigorous" than it would have been for an attorney seeking reinstatement after disbarment. Moreover, the majority declared, its "task here is not to dwell on his past misdeeds, but to determine his present moral fitness." It added that because the "policy of the state favors admission of applicants who have achieved reformation," the majority resolved any reasonable doubt concerning Glass's rehabilitation in his favor and "[gave] him the benefit of any conflicting but equally reasonable inferences flowing from the evidence." The majority concluded that "[c]umulatively, Glass's legal employment history, community service, character witnesses, progress in therapy, remorse and acceptance of responsibility" provided a more accurate picture of his moral character than his misconduct of many years ago.

The majority acknowledged that Glass had not fully identified his fabrications until the California bar proceedings, but observed that Glass had not asked the bar to excuse that failure. The majority also expressed some concern regarding Glass's New York bar application, observing that he had "mischaracterized the degree to which he cooperated with the magazines to identify the fabricated articles." On the other hand, in the majority's view, Glass's careful review of his prior articles in connection with the California State Bar

21

proceedings indicated that he had fully acknowledged his wrongdoing, an " 'essential step towards rehabilitation.' " In addition, the majority concluded that Glass had left it to his attorneys to work with the magazines because of his emotional turmoil, and "[t]he State Bar did not prove whether Glass's attorney failed to 'work with' some of the publishers and neither did Glass establish that his attorney had completed the task as requested."

The majority commented upon Glass's excellent reputation with law professors and judicial employers, and observed that Glass's rehabilitation seemed to have occurred over a number of years. The majority recounted the course of Glass's therapy and his therapists' testimony on his behalf in support of the view that he was rehabilitated. The majority further referred to Glass's community service in New York and commented that his work commitments rendered him unable to continue non-work-related community service in Los Angeles, where he had resided since 2004.

The majority placed great emphasis on Glass's character witnesses, saying: "We afford great weight to Glass's character witnesses, who were community leaders, employers, judges, and attorneys, and all of whom spoke with the utmost confidence in Glass's good moral character and rehabilitation."

The majority declined to believe restitution was required of Glass. "We consider his present character in light of his previous moral shortcomings [citation], and we are at a loss to understand how monetary restitution would mitigate the reputational harm that Glass had caused." The majority found more significant evidence that he has made amends both to the journalistic community in his public admissions concerning his fabrications and to his victims in the letters he sent them.

The majority concluded that "even those who have committed serious, indeed egregious, misconduct, are capable of overcoming their past misdeeds" and

22

that persons who had reformed should be rewarded with an opportunity to serve as lawyers.

The Review Department panel's dissenting opinion concluded that Glass had not proven full rehabilitation, pointing to his " 'staggering' " two-year period of "multi-layered, complex and harmful course of public dishonesty." The dissenting judge found especially troubling Glass's omissions and misstatements in his application to the New York bar. "[T]o gain admission to practice law in New York, Glass understated the number of articles he had fabricated and exaggerated his efforts to help the magazines identify those articles. At a time when he should have been scrupulously honest, he presented an inaccurate application because it benefitted him — the same behavior as his earlier misconduct." The dissenting opinion concluded: "Given the magnitude of his misconduct and his subsequent misrepresentations on his New York bar application, Glass has not shown proof of reform by a lengthy period of exemplary conduct which 'we could with confidence lay before the world' to justify his admission."

## II. DISCUSSION

### A. Applicable Law

To be qualified to practice law in this state, a person must be of good moral character. (Bus. & Prof. Code, §§ 6060, subd. (b), 6062, subd. (a)(2).) Good moral character includes "qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, respect for and obedience to the law, and respect for the rights of others and the judicial process." (Rules of State Bar, tit. 4, Admissions and Educational Stds., rule 4.40(B); see also Bus. & Prof. Code, § 6068.) "Persons of good character . . . do not commit acts or crimes involving moral turpitude — a concept that embraces a wide range of deceitful and depraved behavior." (*In re Gossage* (2000) 23 Cal.4th 1080, 1095 (*Gossage*).) A lawyer's

23

good moral character is essential for the protection of clients and for the proper functioning of the judicial system itself. (See *In re Johnson* (1992) 1 Cal.4th 689, 705-706 (conc. & dis. opn. of Kennard, J.).)

When the applicant has presented evidence that is sufficient to establish a prima facie case of his or her good moral character, the burden shifts to the State Bar to rebut that case with evidence of poor moral character. Once the State Bar has presented evidence of moral turpitude, the burden "falls squarely upon the applicant to demonstrate his [or her] rehabilitation." (*Gossage*, *supra*, 23 Cal.4th at p. 1096.)

Of particular significance for the present case is the principle that "the more serious the misconduct and the bad character evidence, the stronger the applicant's showing of rehabilitation must be." (*Gossage*, *supra*, 23 Cal.4th at p. 1096.) "Cases authorizing admission on the basis of rehabilitation commonly involve a substantial period of *exemplary* conduct following the applicant's misdeeds." (*Ibid.*, italics added.) Moreover, "truly exemplary" conduct ordinarily includes service to the community. (*In re Menna* (1995) 11 Cal.4th 975, 990 (*Menna*).)

We independently weigh the evidence that was before the State Bar Court (*Gossage*, *supra*, 23 Cal.4th at p. 1096), recognizing that the applicant bears the burden of establishing good moral character. (*Menna, supra,* 11 Cal.4th at p. 983.) We ask whether the applicant is fit to practice law, paying particular attention to acts of moral turpitude (*Kwasnik v. State Bar* (1990) 50 Cal.3d 1061, 1068 (*Kwasnik*)) and prior misconduct that bears particularly upon fitness to practice law. (*Hallinan v. Committee of Bar Examiners* (1966) 65 Cal.2d 447, 452 (*Hallinan*).)

In reviewing moral fitness findings made by the State Bar, we accord significant weight to the State Bar Court hearing judge's findings of fact to the extent they are based on witness demeanor and credibility. (*Gossage*, *supra*, 23

Cal.4th at p. 1096.)  Although "the moral character determinations of the Committee and the State Bar Court play an integral role in the admissions decision, and both bear substantial weight within their respective spheres," we are not bound by the determinations of the Committee or the State Bar Court.  (*Ibid.*) Rather, we "independently examine and weigh the evidence" to decide whether the applicant is qualified for admission.  (*Ibid.*; see also *In re Rose* (2000) 22 Cal.4th 430, 455 ["we afford de novo review of questions of fact and law"]; *Menna, supra,* 11 Cal.4th at p. 985.)

Contrary to the Review Department majority's view that Glass's burden was significantly lighter than it would be for an attorney seeking readmission because he was a first-time applicant, in many respects the difference between admission and disciplinary proceedings is "more apparent than real."  (*Hallinan, supra*, 65 Cal.2d at p. 452.)  "Because both admission and disciplinary proceedings concern fitness to practice law as evidenced by acts of moral turpitude, this court routinely consults its disciplinary cases in deciding whether applicants for admission possess, at the outset, the requisite moral character." (*Gossage, supra*, 23 Cal.4th at p. 1095.)  At both admission and disciplinary proceedings, "[t]he common issue is whether the applicant for admission or the attorney sought to be disciplined 'is a fit and proper person to be permitted to practice law, and that usually turns upon whether he has committed or is likely to continue to commit acts of moral turpitude' " (*Kwasnik, supra*, 50 Cal.3d at p. 1068), particularly misconduct that bears upon the applicant's fitness to practice law.  (*Hallinan, supra*, at p. 471.)

"However, unlike in disciplinary proceedings, where the State Bar must show that an already admitted attorney is unfit to practice law and deserves professional sanction, the burden rests upon the candidate for admission to prove his own moral fitness."  (*Gossage, supra*, 23 Cal.4th at p. 1095.)

*B. Analysis*

The Review Department majority believed it was reasonable to draw all inferences in favor of Glass, failing to be constrained by our discussion in *Gossage*, *supra*, 23 Cal.4th 1080, as we shall explain. Although an applicant ordinarily receives the benefit of the doubt as to "conflicting equally reasonable inferences" concerning moral fitness (*id.* at p. 1098), the State Bar Court majority failed to recognize that this rule does not materially assist applicants who have engaged in serious misconduct. This is because "[w]here serious or criminal misconduct is involved, positive inferences about the applicant's moral character are more difficult to draw, and negative character inferences are stronger and *more reasonable*." (*Id.* at p. 1098, italics added.) When there have been very serious acts of moral turpitude, we must be convinced that the applicant "is no longer the same person who behaved so poorly in the past," and will find moral fitness "only if he [or she] has since behaved in exemplary fashion over a meaningful period of time." (*Ibid*.)

Applying the *Gossage* standard in this case of egregious malfeasance, we begin our own independent review of the record with a focus on Glass's many acts of dishonesty and professional misconduct, and then ask whether he has established a compelling showing of rehabilitation and truly exemplary conduct over an extended period that would suffice to demonstrate his fitness for the practice of law.

Glass's conduct as a journalist exhibited moral turpitude sustained over an extended period. As the Review Department dissent emphasized, he engaged in "fraud of staggering' proportions" and he "use[d] . . . his exceptional writing skills to publicly and falsely malign people and organizations for actions they did not do and faults they did not have." As the dissent further commented, for two years he "engaged in a multi-layered, complex, and harmful course of public dishonesty."

26

Glass's journalistic dishonesty was not a single lapse of judgment, which we have sometimes excused, but involved significant deceit sustained unremittingly for a period of years. (See *Hall v. Committee of Bar Examiners* (1979) 25 Cal.3d 730, 742 [applications may be rejected in cases of "numerous fraudulent acts" and "false statements"].) Glass's deceit also was motivated by professional ambition, betrayed a vicious, mean spirit and a complete lack of compassion for others, along with arrogance and prejudice against various ethnic groups. In all these respects, his misconduct bore directly on his character in matters that are critical to the practice of law.

Glass not only spent two years producing damaging articles containing or entirely made up of fabrications, thereby deluding the public, maligning individuals, and disparaging ethnic minorities, he also routinely expended considerable efforts to fabricate background materials to dupe the fact checkers assigned to vet his work. When exposure threatened, he redoubled his efforts to hide his misconduct, going so far as to create a phony Web site and business cards and to recruit his brother to pose as a source. In addition, to retain his position, he engaged in a spirited campaign among the leadership at The New Republic to characterize Lane's obviously well-founded concerns as unfair and to retain his position.

Glass's conduct during this two-year period violated ethical strictures governing his profession. Believing that "public enlightenment is the forerunner of justice and the foundation of democracy," the Code of Ethics of the Society of Professional Journalists provides that "[t]he duty of the journalist is to further those ends by seeking truth and providing a fair and comprehensive account of events and issues[,] . . . striv[ing] to serve the public with thoroughness and honesty. . . . [¶] . . . [¶] . . . Deliberate distortion is never permissible." (Code of Ethics of the Society of Professional Journalists (1996 rev.) reprinted in Brown et

al., Journalism Ethics, a Casebook of Professional Conduct (4th ed., 2011) p. 8.) Glass's behavior fell so far short of this standard that Lane recounted seeing Glass featured in an exhibit in the Newseum, a Washington, D.C. museum dedicated to journalism, as embodying one of the worst episodes of deceit in journalistic history.

Glass's misconduct was also reprehensible because it took place while he was pursuing a law degree and license to practice law, when the importance of honesty should have gained new meaning and significance for him.

Moreover, Glass's lack of integrity and forthrightness continued beyond the time he was engaged in journalism. Once he was exposed, Glass's response was to protect himself, not to freely and fully admit and catalogue all of his fabrications. He never fully cooperated with his employers to clarify the record, failed to carefully review the editorials they published to describe the fabrications to their readership, made misrepresentations to The New Republic regarding some of his work during the period he purported to be cooperating with that magazine, and indeed some of his fabrications did not come to light until the California State Bar proceedings. He refused to speak to his editor at George magazine when the latter called to ask for help in identifying fabrications in the articles Glass wrote for that magazine.

The record also discloses instances of dishonesty and disingenuousness occurring after Glass's exposure, up to and including the State Bar evidentiary hearing in 2010. In the New York bar proceedings that ended in 2004, as even the State Bar Court majority acknowledged, he made misrepresentations concerning his cooperation with The New Republic and other publications and efforts to aid them identify all of his fabrications. He also submitted an incomplete list of articles that injured others. We have previously said about omissions on bar applications: "Whether it is caused by intentional concealment, reckless disregard

28

for the truth, or an *unreasonable refusal to perceive the need for disclosure*, such an omission is itself strong evidence that the applicant lacks the 'integrity' and/or 'intellectual discernment' required to be an attorney." (*Gossage*, *supra*, at p. 1102, italics added.)

Our review of the record indicates hypocrisy and evasiveness in Glass's testimony at the California State Bar hearing, as well. We find it particularly disturbing that at the hearing Glass persisted in claiming that he had made a good faith effort to work with the magazines that published his works. He went through many verbal twists and turns at the hearing to avoid acknowledging the obvious fact that in his New York bar application he exaggerated his level of assistance to the magazines that had published his fabrications, and that he omitted from his New York bar list of fabrications some that actually could have injured real persons. He also testified that he told his lawyer to work with Harper's Magazine to identify his fabrications, yet evaded questions concerning whether his lawyer had done so, while insisting that he took responsibility for an inferred failure to follow what obviously were significant instructions. He asserted that he had been too distraught to recognize that the list of fabrications The New Republic gave his lawyer was incomplete — or that in his response he had denied that articles including the egregious *Taxis and the Meaning of Work* were in fact fabricated — while acknowledging that within a few days of his firing he made arrangements to reschedule a final examination for the end of the exam period and did well on the exam he took within a week of his exposure. Indeed, despite his many statements concerning taking personal responsibility, and contrary to what he suggested in his New York bar application, it was not until the California Bar proceedings that he shouldered the responsibility of reviewing the editorials his employers published disclosing his fabrications, thus failing to ensure that all his very public lies had been corrected publically and in a timely manner. He has "not acted with the

29

'high degree of *frankness* and truthfulness' and the 'high standard of integrity' required by this process." (*Gossage*, *supra*, 23 Cal.4th at p. 1102, italics added.)

Honesty is absolutely fundamental in the practice of law; without it, " ' " 'the profession is worse than valueless in the place it holds in the administration of justice.' " ' " (*Menna*, *supra*, 11 Cal.4th at p. 989.) "[M]anifest dishonesty . . . provide[s] a reasonable basis for the conclusion that the applicant or attorney cannot be relied upon to fulfill the moral obligations incumbent upon members of the legal profession." (*Hallinan*, *supra*, 65 Cal.2d at p. 471.) As the dissent in the Review Department pointed out, "if Glass were to fabricate evidence in legal matters as readily and effectively as he falsified material for magazine articles, the harm to the public and profession would be immeasurable."

We also observe that instead of directing his efforts at serving others in the community, much of Glass's energy since the end of his journalistic career seems to have been directed at advancing his own career and financial and emotional well-being.

As Justice Kennard did in her concurring opinion in *Kwasnik*, *supra*, 50 Cal.3d 1061, we do well to repeat Justice Felix Frankfurter's "eloquent description" of the moral character required of lawyers: " 'It is a fair characterization of the lawyer's responsibility in our society that he [or she] stands "as a shield" . . . in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character.' " (*Id.* at p. 1076.)

As for Glass's case for admission, although he points to his youth at the time of his employment as a journalist and an asserted period of rehabilitation of 12 years (measured between the time he was fired and the hearing in the State Bar

30

Court), we have outlined instances of dishonesty and disingenuousness persisting throughout that period, including at the California State Bar evidentiary hearing. In addition, Glass's behavior was under the scrutiny of first the New York bar from 2002 to 2004, and then the California Bar from 2007 to 2010, reducing the probative value of the evidence of his good conduct during those periods. "[G]ood conduct generally is expected from someone who has applied for admission with, and whose character is under scrutiny by, the State Bar." (*Gossage*, *supra*, 23 Cal.4th at p. 1099; see also *Menna*, *supra*, 11 Cal.4th at p. 989.)

The Review Department majority relied heavily on the testimony of Glass's character witnesses, but the testimony of character witnesses will not suffice by itself to establish rehabilitation. (*Menna*, *supra*, 11 Cal.4th at p. 988.) Moreover, stressing that Glass's reputation as a journalist had been exploded and that so many years had passed, some of the character witnesses did not sufficiently focus on the seriousness of the misconduct, incorrectly viewing it as of little current significance despite its lingering impact on its victims and on public perceptions concerning issues of race and politics. They also did not take into account, as we do, that the misconduct reflected poorly on the particular commitment to honesty that Glass might have been expected to have had as a law student. (See *Rhodes v. State Bar* (1989) 49 Cal.3d 50, 60 [referring to " ' "the fundamental rule of [legal] ethics — that of common honesty" ' "].) For these reasons we believe the Review Department majority accorded too much probative value to the testimony of Glass's character witnesses.

Glass emphasized the remorse he expressed through his letters to victims, and characterized his novel and his appearance on *60 Minutes* as efforts to make amends. Remorse does not establish rehabilitation, however (*Menna, supra,* 11 Cal.4th at p. 991), and in any event, the weight of this evidence is diminished because the letters were not written near the time of his misconduct and exposure,

31

when they might have been most meaningful to the victims, but rather seemed timed to coincide with his effort to become a member of the New York bar. The novel served Glass's own purposes, producing notoriety and a fee of $175,000, and the appearance on *60 Minutes* was timed to coincide with the release of the novel. Glass did not offer any restitution to Lane or Bradley. It was not until approximately 2008 that he made an offer to the then-friendly Peretz — who roundly disclaimed any interest in restitution — to repay his salary. This offer was made after Glass applied to the California Bar and was another oddly belated and, we believe, disingenuous effort at making his victims whole.

The record of Glass's therapy does not represent "truly exemplary conduct in the sense of returning something to the community." (*Menna*, *supra*, 11 Cal.4th at p. 990.) To be sure, through therapy he seems to have gained a deep understanding of the psychological sources of his misconduct, as well as tools to help him avoid succumbing to the same pressures again. His treating psychiatrists are plainly highly competent and well regarded in their field, and they are convinced that he has no remaining psychological flaws tending to cause him to act dishonestly. Glass believed that he could best make amends by changing himself. But his 12 years of therapy primarily conferred a personal benefit on Glass himself. (See *ibid*. [participation in Gamblers Anonymous was not "truly exemplary," in part because of the substantial personal benefit it conferred on the applicant].)

Glass points to the pro bono legal work he does for clients of his firm as evidence of sustained efforts on behalf of the community, but we observe that pro bono work is not truly *exemplary* for attorneys, but rather is expected of them. (See Bus. & Prof. Code, § 6073.)

Glass and the witnesses who supported his application stress his talent in the law and his commitment to the profession, and they argue that he has already

paid a high enough price for his misdeeds to warrant admission to the bar. They emphasize his personal redemption, but we must recall that what is at stake is not compassion for Glass, who wishes to advance from being a supervised law clerk to enjoying a license to engage in the practice of law on an independent basis. Given our duty to protect the public and maintain the integrity and high standards of the profession (see *Gossage*, *supra*, 23 Cal.4th at p. 1105), our focus is on the applicant's moral fitness to practice law. On this record, the applicant failed to carry his heavy burden of establishing his rehabilitation and current fitness.

## III. CONCLUSION

For the foregoing reasons, we reject the State Bar Court majority's recommendation and decline to admit Glass to the practice of law.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Glass on Admission

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S196374
**Date Filed:** January 27, 2014

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Law Offices of Michael A. Willemsen, Michael A. Willemsen; Eisenberg & Hancock, John B. Eisenberg, William N. Hancock; Greines, Martin, Stein & Richland, Kent L. Richland; Margolis & Margolis, Susan L. Margolis and Arthur L. Margolis for Applicant Stephen Randall Glass.

Aaron Nathan Shechet and Leigh Anne Chandler as Amici Curiae on behalf of Applicant Stephen Randall Glass.

Starr Babcock, Richard J. Zanassi, Rachel Grunberg; and Brandon Tady for Petitioner Committee of Bar Examiners of The State Bar of California.

Robert D. McMahon as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John B. Eisenberg
Eisenberg & Hancock
1970 Broadway, Suite 1200
Oakland, CA  94612
(510) 452-2581

Rachel Grunberg
The State Bar of California
180 Howard Street
San Francisco, CA  94105
(415) 538-2309